513 P.2d 960

**NEW TIMES, INC., an Arizona corporation, and Arizona Civil Liberties Union, an Arizona non-profit corporation, Appellants,**

v.

**ARIZONA BOARD OF REGENTS, B. J. Varney, and Marvin Johnson, Appellees.**

**No. 2 CA–CIV 1378.**

Court of Appeals of Arizona, Division 2.

Sept. 14, 1973.

Rehearing Denied Oct. 23, 1973.

Review Granted Nov. 20, 1973.

S. Leonard Scheff, Tucson, for appellants.

Gary K. Nelson, Atty. Gen., by John S. O'Dowd, Asst. Atty. Gen., Tucson, for appellees.

## OPINION

HATHAWAY, Chief Judge.

The appellant, New Times, Inc., publisher of a general interest newspaper distrib-

uted free of charge and directed at college-aged readers, brought this civil action requesting that a University of Arizona campus regulation restricting distribution of newspapers on campus be declared unconstitutional, that its enforcement be enjoined, and that damages be awarded. The regulation limits newspaper distribution (six newsstands permitted for appellant), imposes a distribution fee of $2.00 per newsstand per distribution, and requires registration of the distributors. The regulation is ostensibly to prevent litter by limiting distribution, and to defray expenses in removing resulting litter. The school newspaper, *The Wildcat,* is specifically exempted from the regulation. At trial the lower court found the regulation to be constitutional and the fee imposed thereby to be reasonable.

The regulation is as follows:

"1. Newspapers, as defined herein, other than the Arizona Daily Wildcat, may be distributed on the campus or grounds or in the buildings of the University of Arizona only in accordance with these regulations.

2. The term 'newspaper' when used in these regulations shall include newspapers whether or not published or distributed regularly and whether or not a charge is made therefor.

3. Any person desiring to distribute a newspaper on the campus or grounds or in buildings of the University only by sale in coin-vending machines may apply to the Director of the Student Union for permission to place vending machines at such appropriate locations as the Director shall designate. The Director shall cause space to be made available at such locations for the vending machines of any newspaper so applying. No newspaper coin-vending machines shall be permitted or placed in any other locations on the campus or grounds or in the buildings of the University.

4. Any person desiring to distribute a newspaper on the campus or grounds or in buildings of the University by means other than by sale in coin-vending machines may apply to the Director of the Student Union for permission to place racks, stalls, or other containers for distribution at such appropriate locations as the Director shall designate. The Director of the Student Union shall cause space to be made available at not more than six such locations, if, and so long as:

(a) Each applicant has completed an application form which shall set forth, in addition to such other information as may be required by the Director of the Student Union, the true names and principal addresses of the real publisher or publishers, and the real distributor or distributors of the newspaper; and

(b) The applicant has provided for the distribution of the newspapers at each such location an appropriate rack, stall, or other container in which the papers can be kept in an orderly manner; and

(c) The applicant has paid, in advance, the sum of $2.00 for each daily, weekly, monthly, or other publication of the newspaper for each location applied therefor. (For example, a weekly publication distributed at three locations would pay $6.00 per week; a monthly publication distributed at six locations would pay $12.00 per month.)

5. Any person aggrieved by any act, decision, or order of the Director of the Student Union may within fifteen days from such act, decision, or order, appeal to the Vice President of the University for University Relations, who may affirm that act, decision, or order or modify it as he shall see fit within the limitations imposed by these regulations."

Appellant alleges that the regulation violates its First Amendment rights in that it restricts the circulation of its newspaper. Appellees' defense of the regulation is premised upon its comprising a regulation of the time, place and the manner in which

appellant may distribute its newspaper on university property. The question with which we are therefore presented is whether a state university may constitutionally restrict the distribution of newspapers to certain limited areas and impose a distribution "fee" upon such newspapers.

■ The evils sought to be prevented by enactment of the First Amendment were not merely censorship of the press but also infringements upon distribution of ideas, for without distribution of such ideas, the freedoms guaranteed by the First Amendment become merely platitudes. Near v. State of Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Although these freedoms are not absolute, any restriction upon them must be closely and carefully scrutinized so that different and inherently suspect ideas will not be suppressed under the auspices of permissible police regulations. Throughout our nation's history the First Amendment and the rights guaranteed thereunder have been jealously protected thus encouraging the free flow of new ideas and the testing of old, hopefully to the people's benefit.

■ Justification for the restrictions imposed by the subject regulation has been sought on the basis that dissemination of the newspaper ultimately causes litter. This reason for the regulation falls when placed in the balance with the guarantees of the First Amendment. The United States Supreme Court has addressed itself to this argument.

". . . Any burden imposed upon the city authorities in cleaning and caring for the streets as an indirect consequence of such distribution results from the constitutional protection of the freedom of speech and press. This constitutional protection does not deprive a city of all power to prevent street littering. There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets." Schneider v. State, 308 U.S. 147, 162, 60 S.Ct. 146, 151, 84 L.Ed. 155, 165 (1939).

The university further argues that the type of distribution boxes used by the newspaper allow them to blow out and cause litter. We do not question the university's right to enact *reasonable* regulations prescribing construction of boxes for alleviation of this problem, but clearly it cannot restrict distribution on the basis of "litter" control. Furthermore, testimony indicated that most of the litter was caused by the readers picking up the newspaper and subsequently discarding it.

Appellees take issue with appellant that distribution is not restricted because no limitation is placed on the number of newspapers that may be placed in each of the six allotted stands. The simple answer to this is that the university may not abridge appellant's First Amendment rights on the basis that they may be exercised at some other place. Schneider v. State, supra.

■■ The fee imposed by the regulation is also attacked as violative of the First Amendment. Rationalization for the fee is that it must be imposed to collect the litter which the newspaper causes. The evidence, however, does not disclose that the fee is reasonable or that it was computed on the basis of the "litter" actually caused by the newspaper stands. We do not reach the question as to the propriety of a fee, under these circumstances, for the reason that the appellees have not met their burden of showing its reasonableness. With respect to the burden of proof in these situations, the District of Columbia court has stated:

"We think we may now hold that when legislation appears on its face to affect the use of speech, press, or religion, and when its validity depends upon the existence of facts which are not proved, their existence should not be presumed; at least when their existence is hardly more probable than improbable, and particularly when proof concerning them is more

readily available to the government than to the citizen. The burden of proof in such a case should be upon those who deny that these freedoms are invaded. In many contexts it is both rational and convenient to presume 'the existence of facts supporting the legislative judgment.' But it would be neither rational nor convenient to presume that the uniform fee by which Congress sought to cover the cost of policing all sorts of street sales happens not to exceed the cost of policing the particular sort involved here. . . . There is no evidence, and no clear probability, that the District of Columbia license fee does not exceed the cost of policing these sales. No presumption which lacks a probable basis in fact should be permitted to conceal an interference with essential freedoms." Busey v. Dist. of Columbia, 138 F.2d 592, 595–596 (D.C.Cir. 1943).

There being no proof of the reasonableness of the fee which has the effect of curtailing First Amendment freedoms, we find the fee unconstitutional.

■ Appellant challenges the trial court's ruling that it had no jurisdiction to entertain the claim for damages under 42 U.S.C.A. § 1983, which provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

■ It is an old and well-established rule that state courts have jurisdiction concurrent with federal courts to enforce federal causes of action unless Congress has specifically provided to the contrary. Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 508, 82 S.Ct. 519, 7 L.Ed.2d 483

(1962); Claflin v. Houseman, 93 U.S. 130, 23 L.Ed. 833 (1876). Early in this nation's history, Alexander Hamilton wrote in the 82d number of The Federalist:

"When . . . we consider the State governments and the National governments, as they truly are, in light of kindred systems, and as parts of *one whole,* the inference seems to be conclusive, that the State courts would have concurrent jurisdiction in all cases a ing under the laws of the Union, where it was not expressly prohibited." (Emphasis in original)

■ 28 U.S.C.A. § 1343, the jurisdictional grant keyed to section 1983, contains no language granting exclusive jurisdiction to federal courts. The statute merely confers "original jurisdiction" upon the district courts. The phrase "original jurisdiction" has uniformly been defined as the power to entertain cases in the first instance as distinguished from appellate jurisdiction and does not mean exclusive jurisdiction. See Bors v. Preston, 111 U.S. 252, 4 S.Ct. 407, 409, 28 L.Ed. 419 (1884); People of the Territory of Guam v. Rosario, 296 F.Supp. 140 (D.C.Guam 1969); and Petros v. Bosen, 185 Okl. 351, 91 P. 2d 735, 736 (1939). Moreover, section 1 of the Civil Rights Act of 1871 (17 Stat. 13), as originally introduced, provided for "such proceeding to be prosecuted in the several district or circuit courts of the United States . . . ." (17 Stat. 13). This language was later deleted in the 1873–74 codification. See R.S. §§ 563(12), 629(16) (2d ed. 1873–74). This is some indication that Congress did not intend to confer exclusive jurisdiction over § 1983 actions upon the federal courts.

Despite the fact that concurrent federal and state jurisdiction is the rule rather than the exception, it has been argued that the legislative history of section 1983 mandates exclusive federal jurisdiction. In the only case we have found where a state court has refused to exercise jurisdiction

in a section 1983 action, the Supreme Court of Tennessee concluded that the section "owes its very existence to Congressional recognition of reluctance or refusal of state courts to act." Chamberlain v. Brown, 223 Tenn. 25, 442 S.W.2d 248, 252 (1969).

We agree that section 1983 was enacted to override certain types of state laws, to provide a supplemental federal remedy where state law was inadequate, and to provide a federal remedy where state law was adequate in theory but unavailable in practice. See McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L. Ed.2d 622 (1963), and Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). However, we do not see how a Congressional purpose to supplement state remedies leads to an implication of exclusive federal jurisdiction.

In Monroe v. Pape, supra, the Supreme Court did hold that because section 1983 was enacted to supplement inadequate state remedies, the plaintiff did not have to first pursue those remedies before suing in federal court. The doctrine of abstention was therefore held inapplicable to section 1983 actions. While the purpose behind section 1983 supports the view that a plaintiff should be able to sue first in federal court (bypassing state remedies), it does not dictate that a plaintiff should be denied a state court forum when, as here, he voluntarily files his suit in state court. In other words, there is no indication that the framers of section 1983 intended to prevent a plaintiff from suing in state court *if he so desired*. Their only concern was that he be given a federal forum whenever he wanted a federal forum.

Although there have been few cases dealing with the question, several courts have held that state courts have jurisdiction over section 1983 actions. See Lakewood Homes, Inc. v. Bd. of Adjustment of City of Lima, 258 N.E.2d 470 (Ohio Ct.C. P.1970); Clark v. Bond Stores, Inc., 41 A.D.2d 620, 340 N.Y.S.2d 847 (1973);

Long v. District of Columbia, 469 F.2d 927 (D.C.Cir.1972); and Luker v. Nelson, 341 F.Supp. 111 (N.D.Ill.1972). See also C. Antieau, Federal Civil Rights Acts § 29 (1971) and Note, 82 Harv.L.Rev. 1486, 1497 n. 62 (1969).

■ A defendant is nowise prejudiced in having a state court decide federal questions. The federal removal statute, 28 U. S.C.A. § 1441, literally applies here and appellees could have removed this case to federal court had they timely exercised the right. Thus we see that our state courts will try § 1983 cases only when a defendant by failing to seek removal, consents thereto.

No public policy requires that state courts refuse to entertain § 1983 actions. Assumption of jurisdiction in state courts would, on the contrary, operate to the convenience of the parties on occasions. We note that many citizens of this state, because of their geographical residence, would be inconvenienced if they were forced to litigate in a federal, rather than a state, court. Moreover, there is strong authority indicating that the Federal Constitution prohibits a state court of general jurisdiction from refusing to exercise jurisdiction over a suit solely because it is brought under a federal law. Testa v. Katt, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947); McKnett v. St. Louis & S. F. Ry., 292 U.S. 230, 54 S.Ct. 690, 78 L.Ed. 1227 (1934); Mondou v. N. Y., N. H. & H. R. Co., 223 U.S. 1, 32 S.Ct. 169, 56 L. Ed. 327 (1912). We refuse to read an impediment into the statute which would preclude state courts from granting a full measure of relief from wrongs inflicted by state agencies.

We therefore hold that an action brought under 42 U.S.C.A. § 1983 is proper in state court.

Reversed for further proceedings not inconsistent with this opinion.

KRUCKER, and HOWARD, JJ., concur.