869 P.2d 183

**RESOLUTION TRUST CORPORATION, as conservator of Western Savings and Loan Association, F.A., a federal savings and loan association, and as receiver of Western Savings and Loan Association, an Arizona corporation; and Western Savings and Loan Association, an Arizona corporation, Plaintiff-Appellant, Cross–Appellee,**

v.

**Kenneth A. FOUST, a single man, aka Ken Foust, Defendant–Appellee, Cross Appellant.**

No. 1 CA–CV 90–194.

Court of Appeals of Arizona, Division 1, Department C.

March 18, 1993.

Reconsideration Denied April 30, 1993.

---

of the factual and procedural posture of this action, we discuss both in some detail.

## I.

In 1985, Western Savings loaned Foust and Fred Andrews money pursuant to the terms of a promissory note (the note). That same year, Foust purchased property at Pinnacle Peak (the property), on which he later gave Western Savings a lien to secure the note. In February 1986, Foust hired a general contractor and in April 1986, he began construction of a house on the property. Foust listed the house for sale in July 1986. In the fall of 1986, Foust's general contractor withdrew from the project and Foust took over construction. Foust contracted to sell the house to Roger Trunkett (Trunkett) in January 1987.

Foust needed additional financing to complete construction of the house. His counterclaim arises from his allegation that Western Savings, through its agent Al Cameron (Cameron), made several loan commitments to him, none of which Western Savings honored. Foust alleged that he and Western Savings negotiated the terms and amounts of the loan commitments but conceded that neither party prepared written documentation of these agreements. Also, Western Savings' records revealed no documentation of the loan commitments. Trial testimony revealed that the various amounts Foust claimed Western Savings agreed to loan would have financed complete construction of the Pinnacle Peak house, paid off the note, and paid off the balance owed on the property. Foust's sale to Trunkett did not close, and another financing company eventually foreclosed on the property in August 1988.

In August 1987, Western Savings sued Foust for allegedly defaulting on the note. Foust filed a noncompulsory counterclaim that included various tort claims as well as claims for breach of contract and illegal filing of a lis pendens.

The trial court granted Western Savings summary judgment on its claim against Foust. Trial on Foust's counterclaim began on June 5, 1989. On June 14, 1989, the court granted a directed verdict for Western Sav-

Gust, Rosenfeld & Henderson by James G. Speer, Richard A. Segal, Patricia A. Sallen, Phoenix, for plaintiff-appellant, cross appellee.

Allen, Kimerer, LaVelle by Michael J. La-Velle, Merrick B. Firestone, Phoenix, for defendant-appellee, cross appellant.

## OPINION

McGREGOR, Judge.

This action initially involved relatively straightforward disputes between Western Savings and Loan Association (Western Savings) and Kenneth Foust (Foust). When the Resolution Trust Corporation (RTC) became Western Savings' receiver near the end of a jury trial involving Western Savings and Foust, however, issues arose about the subject matter jurisdiction of the state courts and the continued viability of a counterclaim asserted by Foust. Because resolution of those issues on appeal requires consideration

ings on the bad faith claim and the claim for punitive damages. On June 15, the court submitted the claims for breach of contract, illegal lis pendens, intentional interference, negligent misrepresentation, and fraud to the jury. Later that day, the jury returned a special verdict in favor of Western Savings on the lis pendens claim. It also returned a general verdict awarding Foust damages of $252,000.00.

On June 14, 1989, the day before the jury returned its verdict, a series of events began that inserted additional issues into these proceedings. According to evidence to which the parties stipulated after trial, the Federal Home Loan Bank Board determined that Western Savings was insolvent and appointed the Federal Savings and Loan Insurance Corporation (FSLIC) as receiver of Western Savings on June 14, 1989. On that same date, Western Savings and Loan Association, F.A., was created and FSLIC was appointed its conservator.

Before the court instructed the jury on June 15, 1989, the court heard arguments on Western Savings' motion for mistrial. At that time, Western Savings' attorney raised the issue of the possible application of the *D'Oench, Duhme* [1] doctrine to the case. The attorney informed the court that he had neither received formal notification of receivership nor consulted with Western Savings about its change in status. The court denied the motion for mistrial without addressing the possible impact of *D'Oench*.

On October 2, 1989, Western Savings moved to allow admission of additional evidence related to Western Savings' conservatorship and receivership status. In that motion, Western Savings argued the *D'Oench* doctrine applied and precluded Foust's counterclaim. On December 28, 1989, Western Savings and Foust stipulated to the admission of additional evidence needed to consider the impact of the *D'Oench* doctrine upon Foust's claims, although Foust does not

agree the doctrine applies. The trial court did not rule on Western Savings' motion.

On December 22, 1989, Western Savings filed its objections to the form of judgment, again raising the *D'Oench* doctrine. The trial court overruled Western Savings' objections in part and entered final judgment in favor of Foust on his counterclaim, in accord with the jury verdict.

Western Savings timely appealed. Foust cross-appealed from summary judgment entered in favor of Western Savings and from the trial court's order denying him an award of prejudgment interest. By order of May 22, 1990, this court added RTC as appellant and cross-appellee, in its role as conservator/receiver of Western Savings. On May 31, 1990, the Office of Thrift Supervision formally appointed RTC as receiver for Western Savings and Loan Association, F.A.

While this appeal was pending, Foust twice filed administrative claims with RTC based on his judgment. By letter dated July 27, 1990, RTC notified Foust of the formal claims procedure required to assert his claims against Western Savings, and Foust complied with that procedure. Foust received notice that RTC had disallowed his claim by letter dated October 17, 1990.

In its current posture, therefore, this action presents several issues. To resolve RTC's appeal, this court must determine whether RTC's appointment as receiver automatically divests state courts of subject matter jurisdiction over state cases pending prior to RTC receivership. If we retain jurisdiction, this court must then decide whether RTC may assert the *D'Oench* doctrine for the first time on appeal to bar any or all of Foust's claims against Western Savings. If Foust's claims are not barred, we must determine whether the trial court erred in denying Foust prejudgment interest on his verdict against Western Savings. Finally, to resolve the remainder of Foust's cross-appeal, we consider whether the trial court

---

1. We discuss *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) in section II.C., *infra.* In that case, the Supreme Court held that in litigation between a claimant and the FDIC, as successor in interest to a financial institution, the claimant may not rely on any agreement not reflected in documents contained in the institution's records to defeat a claim by the FDIC. *Id.* at 459, 62 S.Ct. at 680.

erred in granting summary judgment in favor of RTC.

We have jurisdiction to hear this appeal pursuant to Ariz.Rev.Stat.Ann. ("A.R.S.") §§ 12–120.21 and 12–2101.

## II. RTC'S APPEAL

### A.

The threshold question we address is whether the federal statutes governing RTC's authority give designated federal courts exclusive jurisdiction over all claims against failed financial institutions to which RTC becomes a party and thus deprive state courts of subject matter jurisdiction in cases filed prior to RTC's appointment as receiver.[2] We hold that they do not.

Resolution of this issue hinges upon our interpretation of the relevant provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183. The central provision is 12 U.S.C. § 1821(d)(6)(A) (West 1989), which outlines the procedure a claimant must follow to obtain review of an RTC decision denying a claim made against RTC in its role as receiver of a failed financial institution. A claimant

> may request administrative review of the claim … or file suit on such claim (*or continue an action commenced before the appointment of the receiver*) in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim).

12 U.S.C. § 1821(d)(6)(A) (emphasis added).[3] Other relevant provisions include section 1821(d)(13)(D), which provides:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over—
>
> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
>
> (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

Finally, section 1821(d)(5)(F)(ii) provides that, subject only to a 90–day stay authorized by section 1821(d)(12)(A),

> the filing of a claim with the receiver shall not prejudice any right of the claimant to continue any action which was filed before the appointment of the receiver.

### B.

State courts have jurisdiction concurrent with that of federal courts to enforce federal causes of action unless Congress specifically provides otherwise. *New Times, Inc. v. Arizona Bd. of Regents,* 20 Ariz.App. 422, 426, 513 P.2d 960, 964 (1973), *vacated on other grounds,* 110 Ariz. 367, 519 P.2d 169 (1974) (citing *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 508, 82 S.Ct. 519, 523, 7 L.Ed.2d 483 (1962)). Additionally, Arizona law establishes a presumption favoring retention over divestiture of jurisdiction. *Daou v. Harris,* 139 Ariz. 353, 356, 678 P.2d 934, 937 (1984) (citations omitted). Any statute that allegedly divests a state court of jurisdiction that has fully vested must be "clear and unambiguous" to overcome the presumption of retention of jurisdiction. *Id.*

In interpreting the jurisdictional requirements of section 1821(d)(6)(A), we will give it a reasonable, rational and sensible construction that will accomplish the legisla-

---

2. Although RTC raised this issue late in the appellate process, questions of subject matter jurisdiction cannot be waived and may be raised any at any stage of the proceedings. *Rojas v. Kimble,* 89 Ariz. 276, 279, 361 P.2d 403, 406 (1961); *Swichtenberg v. Brimer,* 171 Ariz. 77, 82, 828 P.2d 1218, 1223 (App.1991).

3. We agree with RTC that a claimant must exhaust the FIRREA administrative claims procedure in order to proceed against RTC. *Marquis v. FDIC,* 965 F.2d 1148, 1151 (1st Cir.1992); *RTC v. Mustang Partners,* 946 F.2d 103, 106 (10th Cir.1991). The parties agree that Foust has done so.

tive intent. To do so, we consider the words used and the effects and consequences of the statute. Moreover, we will construe various provisions of the statutory scheme to harmonize rather than to contradict one another, *Ban v. Quigley,* 168 Ariz. 196, 198, 812 P.2d 1014, 1016 (App.1990), *review dismissed,* 169 Ariz. 477, 820 P.2d 643 (1991) (citations omitted), and will construe the words of the statute in conjunction with the context and subject matter of the entire act. *Grant v. Bd. of Regents of Universities and State Colleges of Arizona,* 133 Ariz. 527, 529, 652 P.2d 1374, 1376 (1982); *Golder v. Dep't of Rev., State Bd. of Tax Appeals,* 123 Ariz. 260, 265, 599 P.2d 216, 221 (1979).

### 1.

■ In *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981), the Supreme Court held that a party can rebut the presumption that state courts have concurrent jurisdiction with the federal courts by showing (1) an explicit statutory directive that the federal courts have exclusive jurisdiction; (2) an unmistakable implication from the legislative history that Congress intended exclusive federal jurisdiction; or (3) a clear incompatibility between state court jurisdiction and federal interests. *Id.* at 478, 101 S.Ct. at 2875. RTC argues that FIRREA meets all the *Gulf Offshore* criteria and therefore the designated federal courts have exclusive jurisdiction over actions involving RTC as receiver for financial institutions. We disagree.

RTC first asserts FIRREA contains an explicit statutory directive of exclusive federal jurisdiction because section 1821(d)(6)(A) directs that a suit requesting review of a claim against the RTC be filed in one of two federal district courts: the court in which the financial institution's principal place of business is located or the district court for the District of Columbia. Although section 1821 does not expressly state that the jurisdiction of the designated federal courts is exclusive, RTC argues that the language is sufficient to bring FIRREA within the principle that "even where Congress has not expressly stated that statutory jurisdiction is 'exclusive,' . . . a statute which vests jurisdiction in

a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecommunications Research & Action Ctr. v. FCC,* 750 F.2d 70, 77 (D.C.Cir.1984); *Greater Detroit Res. Recovery Auth. v. U.S. E.P.A.,* 916 F.2d 317, 322 (6th Cir.1990). In both these cases relied upon by RTC, however, although the term "exclusive" did not appear in the specific provisions challenged by the plaintiffs, other provisions within the statutory scheme designated the federal courts of appeals as the exclusive forum for review of agency decisions. *Telecommunications Research,* 750 F.2d at 77; *Greater Detroit Res. Recovery Auth.,* 916 F.2d at 321. FIRREA, in contrast, contains no exclusivity language.

■ The fact that FIRREA lacks a specific reference to "exclusive" jurisdiction is not, of itself, determinative because we consider the context and subject matter of the statute and look to the language of the act as a whole to ascertain congressional intent. It is that examination, rather than the absence of any particular phrase, that leads us to conclude that the language of FIRREA is inconsistent with an intent to grant exclusive federal jurisdiction and instead logically supportive of an intent to permit state courts to exercise concurrent jurisdiction.

One strong indication that Congress intended to permit concurrent jurisdiction derives from the specific language of section 1821(d)(6)(A), which refers to a claimant's ability to "continue an action commenced before the appointment of the receiver." Applying the plain meaning of the word "continue," we question how a claimant could "continue" an action commenced in state court if receivership automatically divests the court of subject matter jurisdiction. We believe Congress would have directed a party to "refile" or "recommence" an action in a designated federal court rather than to "continue" an action if it had intended to vest exclusive jurisdiction over a pending action in one of two federal district courts. *See Marquis v. FDIC,* 965 F.2d 1148, 1153 (1st Cir.1992); *Marc Development, Inc. v. FDIC,* 771 F.Supp. 1163, 1168–69 (D.Utah 1991); *Berke v. RTC,* 483 N.W.2d 712, 714 (Minn.App.

1992); *Herbst v. RTC*, 66 Ohio St.3d 8, 607 N.E.2d 440 (1993).

We find an additional indication that Congress intended to permit concurrent jurisdiction in the stay provision set out in sections 1821(d)(12)(A) and (B). Section 1821(d)(12)(A) permits the receiver to request a stay for up to 90 days after the receiver's appointment "in any judicial action or proceeding to which [an insured depository institution] is or becomes a party." Section 1821(d)(12)(B) requires that a court receiving such a request "shall grant such stay as to all parties." If a state court automatically loses jurisdiction over a pending action upon the appointment of RTC as receiver, *no* reason whatever exists to stay the pending state proceeding, as a court lacking subject matter jurisdiction would have neither the necessity nor the authority to stay a pending action. *See Marquis*, 965 F.2d at 1153.

The discretionary nature of FIRREA's removal provisions also counsels against finding exclusive federal jurisdiction. Section 1819(b)(2)(B) states that RTC "*may* ... remove any action, suit, or proceeding [to which the Corporation is a party] from a State court to the appropriate United States district court before the end of the 90–day period beginning on the date ... the Corporation is substituted as a party." (Emphasis added.) *See Berke*, 483 N.W.2d at 715. Congress chose to use permissive rather than mandatory language to define RTC's removal authority. If a state court immediately loses jurisdiction when RTC becomes receiver, RTC need not exercise any discretion in deciding whether to remove a case from state court to federal court. Instead, RTC would simply move to dismiss the action for lack of subject matter jurisdiction without complying with a 90–day removal deadline. *Herbst*, 607 N.E.2d 440. We believe the purpose of the removal mechanism is as described in *Lazuka v. FDIC*, 931 F.2d 1530,

1535 (11th Cir.1991), in which the court noted that the removal provisions of FIRREA are intended to "afford the FDIC every possibility of having a federal forum." This well-defined removal mechanism, which permits RTC to select a federal forum, would be unnecessary if Congress had intended to vest exclusive jurisdiction in the designated federal courts. Congress' inclusion of the removal provision therefore also indicates that jurisdiction should be concurrent.

A conclusion that jurisdiction is concurrent permits us to construe various provisions of the statutory scheme to harmonize with rather than to contradict one another. Although section 1821(d)(6)(A) permits a litigant to "continue an action commenced before the appointment of the receiver," FIRREA conspicuously lacks any procedural mechanism for "continuing" in federal court an action tried in a state court. A claimant whose case is pending in state court or in a non-designated federal court when the RTC is appointed receiver can find no procedure in FIRREA explaining how to transfer or to change venue between federal district courts; how to transfer records of the original proceedings between courts; how to determine the effect, if any, of previous findings; or how to anticipate the effect of prior state or federal district court decisions or judgments. Because Congress provided no mechanism consistent both with divesting state courts of jurisdiction upon RTC's appointment as receiver and with "continuing" in federal court actions originally filed in state court, we conclude that Congress intended to permit such actions to remain in their original jurisdictions, unless RTC chooses to employ the established removal procedure.[4]

RTC's position results in another statutory inconsistency. Section 1819(b)(2)(C) authorizes the FDIC, FSLIC or RTC to appeal from federal district court orders remanding

---

4. Under RTC's interpretation, only those claimants with lawsuits already pending in the designated federal district courts could avail themselves of the right to continue an existing lawsuit. In contrast, if a claimant's suit were pending in either a state or a non-designated federal court, that court would lose subject matter jurisdiction. Neither the statutory language nor, as we later discuss, the legislative history of FIRREA supports this distinction, especially in light of Congress' stated purpose to dispose of claims against failed financial institutions "expeditiously and fairly," H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 1, 419 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 215, without prejudice to a claimant's right "to continue any action which was filed before the appointment of the receiver." 12 U.S.C. § 1821(d)(5)(F)(ii).

removed actions to state courts. *Meyerland Co. v. FDIC,* 960 F.2d 512, 519 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 967, 122 L.Ed.2d 123 (1993). Congress would have no reason, however, to permit a district court to remand an action to a state court that lacks subject matter jurisdiction. Thus, RTC's authority to appeal a remand order is logically necessary only if FIRREA permits state courts to exercise concurrent jurisdiction.

Finally, we find support for our conclusion in the language of section 1821(d)(5)(F)(ii), which states that "the filing of a claim with the receiver *shall not prejudice* any right of the claimant to continue any action which was filed before the appointment of the receiver." (Emphasis added.) Dismissing rather than suspending a pending lawsuit until administrative remedies are exhausted would prejudice the claimant by requiring an additional financial investment, as well as more time and judicial resources. *Marquis,* 965 F.2d at 1153–54; *Marc Development, Inc.,* 771 F.Supp. at 1168..

The inevitable prejudice that results from requiring a party to refile and relitigate an action in federal court sustains neither notions of judicial economy nor FIRREA's goal of encouraging the .expeditious and fair disposition of lawsuits against failed financial institutions.

We conclude that FIRREA does not fall within the first of the *Gulf Offshore* criteria.

**2.**

RTC also contends that, even if FIRREA lacks an explicit statutory directive conferring exclusive jurisdiction upon the designated federal courts, the legislative history surrounding the statute demonstrates Congress' intent to create exclusive federal jurisdiction and therefore satisfies the second *Gulf Offshore* criterion. *See* H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 1, 418 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 214–15. As support for its argument, RTC first points out that the legislative history refers only to federal courts. We find that fact of limited assistance, since Congress did not indicate it intended its references, none of which relate to exclusive or concurrent jurisdiction, to over-

turn the usual principle favoring concurrent jurisdiction.

Second, RTC urges that centering RTC litigation in the designated federal courts will further one of Congress' goals in enacting FIRREA, which was to provide a clear set of guidelines with reasonable and specific time limits for claimants and the FDIC to follow. *Id.* at 215; *cf. Coit Independence Joint Venture v. FSLIC,* 489 U.S. 561, 586, 109 S.Ct. 1361, 1375, 103 L.Ed.2d 602 (1989). We agree with RTC that Congress intended to establish reasonable and specific guidelines for resolving claims. We believe, however, that Congress enacted the guidelines to respond to the concerns articulated in *Coit.* In that decision, the Supreme Court directed Congress to establish time limitations on FSLIC's power to adjudicate claims against failed savings and loans and thereby avoid the "black hole from which [claims] may not emerge" which existed under FIRREA's predecessor. *Coit,* 489 U.S. at 586, 109 S.Ct. at 1375. We agree with the *Berke* court that "[t]hese reasons are separate and distinct from that of granting federal courts exclusive jurisdiction over all claims against RTC." *Berke,* 483 N.W.2d at 715 n. 1.

Moreover, RTC's argument overlooks the equally important congressional goal of "dispos[ing] of the bulk of claims against failed financial institutions expeditiously and fairly ... [and allowing] the FDIC to quickly resolve many of the claims against failed financial institutions...." H.R.Rep. No. 54(I), at 215, 1989 U.S.C.C.A.N. at 418. As we have previously noted, requiring courts to dismiss pending state litigation only to permit the parties to refile such cases in federal court upon disallowance of a claim undermines FIRREA's goal of creating an efficient process to handle claims against failed banks. We agree with the comments of the Court of Appeals for the First Circuit, which concluded that divesting a non-designated court of subject matter jurisdiction did not further the legislative purpose of FIRREA:

It is difficult to conceive of anything less efficient than dismissing a suit that has been, say, two years in process, only to have an identical suit started afresh some six months later. By staying all proceed-

ings in a pending action until the administrative claims process has run its course, efficacy will be promoted. At that point, suits based upon resolved claims can be dismissed outright, whereas suits based upon claims still unresolved can simply be resumed, thereby dispelling the need to retrace steps already completed.

*Marquis,* 965 F.2d at 1154.

### 3.

Finally, RTC argues that we should find exclusive federal jurisdiction because, under the third *Gulf Offshore* criterion, allowing multiple state courts to rule on claims disallowed by the RTC is clearly incompatible with significant federal interests. RTC makes the valid argument that exclusive federal jurisdiction centralizes multiple actions related to a specific institution, thereby potentially reducing the costs of litigation by limiting the number of counsel needed to represent RTC, diminishing the likelihood of inconsistent findings of fact and rulings of law common to suits against that institution, and providing uniform interpretation of the statutes governing the activities of the RTC. As we have previously discussed, however, FIRREA permits RTC to remove any action to which it becomes a party to one of the designated federal courts, *see* 12 U.S.C. § 1819(b)(2)(B), and thereby utilize the federal courts when doing so is necessary to protect significant federal interests. Through the removal procedure, RTC can gain the benefits it seeks without depriving the parties of the efficiency gained from permitting concurrent jurisdiction. We conclude that allowing state courts to exercise jurisdiction is not clearly incompatible with significant federal interests.

Under our analysis, therefore, *Gulf Offshore* does not mandate the conclusion that those federal courts designated in FIRREA have exclusive jurisdiction over actions filed prior to RTC receivership and defended by the RTC in its role as receiver.

---

**5.** The Florida court's order does not reveal whether the claimant filed suit before or after FDIC receivership.

### 4.

Although the jurisdictional question before this court remains unsettled, most of the state and federal courts that have considered similar issues have concluded Congress did not intend to confer exclusive jurisdiction upon the designated federal courts. Our analysis of related decisions reveals no case that directly supports RTC's jurisdictional argument.

We find the cases on which RTC relies readily distinguishable from that which we consider. In *Vinton v. Trustbank Savings, F.S.B.,* 798 F.Supp. 1055 (D.Del.1992), the federal district court held without substantial explanation that section 1821(d)(6)(A) does not preclude subject matter jurisdiction but instead operates as a mandatory *venue* provision. *Id.* at 1065. Apparently no other court, prior to or subsequent to *Vinton,* has adopted this view, and we do not find it persuasive or helpful.

In *RTC v. Shoreview Builders, Inc.,* 252 N.J.Super. 408, 599 A.2d 1291 (A.D.1991), the court held that it lacked subject matter jurisdiction to hear a counterclaim filed *after* the RTC became receiver of the failed institution. This opinion likewise is not helpful in analyzing the situation we face, in which Foust filed his counterclaim *before* receivership.

In *Rehman v. FDIC,* No. CL 91–5110–AJ (Fla.Cir.Ct. Feb. 14, 1992), the state court dismissed a claimant's action against the FDIC for lack of subject matter jurisdiction because the claimant failed to comply with the administrative claims procedure.[5] Foust, however, filed suit before receivership, complied with the required claims procedure, and then received a disallowance of his claim.[6] *But see Gumowitz v. First Fed. Sav. & Loan Ass'n,* No. 90–CIV–8083, 1991 WL 84630 (S.D.N.Y. May 17, 1991) (*venue* in non-designated federal district court might be improper); *Bailey v. First City Bank,* No. 91–CA–0132 (La.Ct.App. April 16, 1992) (federal

---

**6.** *See also Circle Indus. v. City Fed. Sav. Bank,* 749 F.Supp. 447, 454 (E.D.N.Y.1990), *aff'd,* 931 F.2d 7 (2nd Cir.1991) (court lacks subject matter jurisdiction if a claimant has not complied with FIRREA administrative claims procedures).

courts have exclusive jurisdiction over the claim after the administrative claims process is exhausted; order does not reveal whether suit filed before or after FDIC receivership).

Finally, RTC refers to a recent order from the United States District Court for the District of Arizona, dismissing a counterclaim against RTC for lack of subject matter jurisdiction. *RTC v. Olsen,* No. CIV 92–0772 PHX CAM (D.Ariz. Oct. 9, 1992). In *Olsen,* however, the claimants filed their counterclaim *after* RTC became Western Savings' receiver and the claimants failed to comply with the administrative claims procedures before filing suit. Thus, *Olsen* also does not address the issue before us.

RTC concedes that several federal courts have concluded that non-designated federal district courts retain subject matter jurisdiction over actions commenced before RTC becomes receiver, if the claimant complies with FIRREA's administrative claim process. *See Marquis,* 965 F.2d 1148; *Aliberti, Larochelle & Hodson Eng. Corp., Inc. v. First Meridian Group,* 795 F.Supp. 42 (D.Me. 1992); *Marc Development, Inc.,* 771 F.Supp. 1163. Because RTC asserts section 1821(d)(13)(D) withdraws jurisdiction from all courts automatically upon the appointment of RTC as receiver, however, RTC regards these decisions to the contrary as incorrect or irrelevant. RTC also points out that the federal cases do not mention the status of state court jurisdiction; each case involves actions that the RTC or FDIC previously removed from state to federal court.

We recognize that the federal decisions criticized by RTC do not directly address the issue of state court jurisdiction. Nevertheless, we find their reasoning and the holdings regarding jurisdiction helpful in deciding whether RTC receivership automatically divests non-designated courts of jurisdiction. Moreover, we do not find the decisions supportive of RTC's position.

In discussing the jurisdiction of federal courts other than those designated under section 1821, courts routinely hold that the explicit stay provisions of section 1821(d)(12) give RTC the option of requesting a stay to permit exhaustion of administrative remedies. The decisions suggest that, after exhausting administrative remedies, the claimant may resume his case in the original court. *See Marquis,* 965 F.2d at 1154; *Praxis Properties v. Colonial Sav. Bank, S.L.A.,* 947 F.2d 49, 63 n. 14 (3rd Cir.1991); *Aliberti, Larochelle,* 795 F.Supp. at 45; *RTC v. Cotten,* 790 F.Supp. 649, 650 (E.D.La. 1992); *Cohen v. RTC,* 784 F.Supp. 197, 201–02 (E.D.Pa.1992); *Marc Development, Inc.,* 771 F.Supp. at 1169; *Coston v. Gold Coast Graphics, Inc.,* 782 F.Supp. 1532, 1535–37 (S.D.Fla.1992).[7] Although RTC asserts that the courts wrongly decided these cases, it provides us not a single case supporting its position that receivership automatically divests jurisdiction in pending state court actions.

In contrast, several recent federal court decisions hold that a non-designated district court does not lose jurisdiction over a pre-receivership case filed outside the jurisdiction of those district courts designated in section 1821(d)(6)(A). *See Marquis,* 965 F.2d 1148; *Aliberti, Larochelle,* 795 F.Supp. 42; *Guidry v. RTC,* 790 F.Supp. 651, 654 (E.D.La.1992); *Cohen,* 784 F.Supp. at 200; *Coston,* 782 F.Supp. at 1536; *see also Matter of NNLC Corp.,* 136 B.R. 611 (Bkrtcy. D.Conn.1992) (bankruptcy court retains jurisdiction subject to stay for exhaustion of FIRREA administrative process; no discussion of dismissal due to lack of subject matter jurisdiction).

Additionally, recent state court decisions conclude that section 1821(d)(6)(A) does not divest state courts of subject matter jurisdiction over cases filed before appointment of a receiver or conservator, if the claimant complies with the administrative claims procedures. *See Connecticut Bank and Trust Co. v. Carriage Lane Assoc.,* 219 Conn. 772, 595 A.2d 334, 338 n. 9 (1991); *Armstrong v. RTC,* 234 Ill.App.3d 162, 175 Ill.Dec. 195, 201–02, 599 N.E.2d 1209, 1215–16 (1992), *appeal allowed,* 148 Ill.2d 639, 183 Ill.Dec. 15, 610 N.E.2d 1259 (1993); *Botschafter v. FDIC,* 33

---

7. In light of RTC's failure to timely remove this case to federal court, we find it instructive that in all the preceding cases except *Aliberti,* the government receiver timely removed the case to federal court prior to requesting dismissal for lack of subject matter jurisdiction.

Mass.App.Ct. 595, 603 N.E.2d 235 (1992); *Berke,* 483 N.W.2d 712; *RTC v. Binford,* 844 P.2d 810, 816 (N.M.1992); *Herbst,* 607 N.E.2d 440.

■ Finally, we note that under general principles of law, jurisdiction is established at the time of filing of the lawsuit and cannot be ousted by subsequent actions or events. *Praxis Properties,* 947 F.2d at 63 n. 14; *Rosa v. RTC,* 938 F.2d 383, 392 n. 12 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991); *State v. Howell,* 107 Ariz. 300, 301, 486 P.2d 782, 783 (1971) (authority derived from A.R.S. § 12–120.21); *Botschafter,* 603 N.E.2d at 239; *Berke,* 483 N.W.2d at 715 (quoting *F. Alderete Gen. Contractors, Inc. v. United States,* 715 F.2d 1476, 1480 (Fed.Cir.1983)); *Binford,* 844 P.2d at 814. We agree with RTC that Congress, in enacting FIRREA, could have overridden the time of filing rule and divested all other courts of jurisdiction. For all the reasons discussed above, however, we conclude that Congress did not intend to override the time of filing rule by its reference to designated courts in section 1821(d)(6)(A).

We conclude that when RTC becomes a receiver for a failed financial institution, section 1821(d)(6)(A) does not vest exclusive jurisdiction over pending state cases in the designated federal district courts. We therefore retain subject matter jurisdiction over this action.

### C.

Because we have subject matter jurisdiction to decide this case, we next consider whether the *D'Oench* doctrine precludes Foust's claims against Western Savings.

■ In *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the Supreme Court held that the maker of a note subject to a secret agreement not to enforce the note could not use lack of consideration as a defense to an action to recover on the note brought by the FDIC as receiver for a bank. *Id.* at 459, 62

8. The Supreme Court has recognized that section 1823(e) reflects the same principles as does the *D'Oench* doctrine. *See Langley v. FDIC,* 484 U.S. 86, 90–93, 108 S.Ct. 396, 400–02, 98 L.Ed.2d 340

S.Ct. at 680. The general rule derived from *D'Oench* and the line of cases succeeding it provides:

> In a suit over the enforcement of an agreement originally executed between an insured depository institution and a private party, a private party may not enforce against a federal deposit insurer any obligation not specifically memorialized in a written document such that the agency would be aware of the obligation when conducting an examination of the institution's records.

*Baumann v. Savers Fed. Sav. & Loan Ass'n,* 934 F.2d 1506, 1515 (11th Cir.1991) (citing *FDIC v. McCullough,* 911 F.2d 593, 600 (11th Cir.1990)), *cert. denied,* —— U.S. ——, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992).

RTC specifically argues that the *D'Oench* doctrine defeats Foust's counterclaim because it derives solely from alleged loan commitments that Foust concedes were not memorialized in Western Savings' institutional records. RTC further argues that the federal statutory provisions codifying the *D'Oench* doctrine [8] preclude Foust's claim as well. Under those statutory provisions, any agreement that does not meet certain standards of formality as described in 12 U.S.C. § 1823(e) cannot support a claim against the receiver or the RTC. 12 U.S.C. § 1821(d)(9)(A). Section 1823(e) states:

> **(e) Agreements against interests of Corporation.** No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it ... as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
>
> (1) is in writing,
>
> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (3) was approved by the board of directors of the depository institution or

(1987); *see also Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n,* 885 F.2d 266, 274 (5th Cir.1989) (aims of section 1823(e) and *D'Oench* are identical and reasoning is applicable to both).

its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.[9]

RTC contends that the alleged loan commitments on which Foust relied for his counterclaim fail to meet these four criteria.

### 1.

■ In opposing RTC's reliance on the *D'Oench* doctrine, Foust first contends that RTC may not raise this defense because RTC only became a party to the appeal and raised this issue after the court entered final judgment for Foust. Foust argues this court may review only issues tried below and may not consider issues that arise after final judgment. *Barrasso v. First Nat'l Bank*, 122 Ariz. 469, 472, 595 P.2d 1014, 1017 (App. 1979).

The record does not support Foust's assertion that Western Savings ignored the issue of the *D'Oench* doctrine's bar of Foust's counterclaims until after final judgment. As we have noted, Western Savings informally raised this defense before the jury retired on June 15, 1989. It formally raised the defense by motion on October 2, 1989, and again on December 22, 1989, well before the trial court entered final judgment on January 12, 1990. Moreover, given the timing of RTC's appointment as receiver, which was the occurrence necessary to place the *D'Oench* doctrine at issue, Western Savings and RTC raised the issue as soon as possible.

The purpose of the general rule preventing parties from raising issues for the first time on appeal is to prevent parties from "keeping certain issues in reserve, hoping to later overturn an unfavorable result." *Baumann*, 934 F.2d at 1513. The court concluded that this concern did not exist in *Baumann* "because RTC was not a party to the suit at the trial level. Now that RTC is a proper party to the suit, it should not be penalized for not raising a defense it had no opportunity to present.... [I]t would be unfair to prevent RTC from raising a legitimate argument at

the earliest time it was able to do so." *Id.* In this action also, preventing RTC from raising a legitimate argument it asserted at the earliest opportunity, and certainly before final judgment was entered, would be unfair. *See also Northwest Land and Investment, Inc. v. New West Fed. Sav. & Loan Ass'n*, 64 Wash.App. 938, 827 P.2d 334, 338 (1992) (*D'Oench* may be raised for first time on appeal if that is the first stage at which the party could do so).

Other recent federal decisions leave to the court's discretion the decision as to whether to permit the RTC to raise the *D'Oench* defense for the first time on appeal. *In re 604 Columbus Avenue Realty Trust*, 968 F.2d 1332 (1st Cir.1992); *RTC v. McCrory*, 951 F.2d 68, 71 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 459, 121 L.Ed.2d 368 (1992) (citations omitted); *Union Fed. Bank v. Minyard*, 919 F.2d 335, 336 (5th Cir.1990).

Foust urges us to follow instead those federal decisions barring RTC from raising the *D'Oench* defense for the first time on appeal. The cases on which Foust relies, however, bar the defense on appeal because the lower courts had voided the assets upon which the FSLIC or FDIC based its claim. *See, e.g., Thurman v. FDIC*, 889 F.2d 1441, 1447 (5th Cir.1989) (void assets prevent FSLIC receiver from acquiring interest to raise *D'Oench* defense; also, new defense would not change outcome); *Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*, 885 F.2d 266, 274–75 (5th Cir.1989) (district court found participation agreements were void and rescinded them so that FSLIC never acquired an asset protected by *D'Oench*); *Grubb v. FDIC*, 868 F.2d 1151, 1158–59 (10th Cir.1989) (district court judgment voided notes before FDIC receivership, thus preventing FDIC from acquiring any "right, title or interest" in the notes on which to base a *D'Oench* defense). We therefore do not find those decisions persuasive.

In Arizona, appellate courts generally will not review issues not argued or factually established in the trial court. *Schoenfelder v. Arizona Bank*, 165 Ariz. 79, 88, 796 P.2d

---

9. Although the "corporation" in this section refers to the FDIC, FIRREA grants the same powers to the RTC pursuant to 12 U.S.C. § 1441a(b)(4).

881, 890 (1990). As the Arizona Supreme Court has noted, however, this general rule and its exception are rules of procedure rather than jurisdiction, established "for the purpose of orderly administration and attainment of justice." *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 503, 733 P.2d 1073, 1086, *cert. denied*, 484 U.S. 874, 108 S.Ct. 212, 98 L.Ed.2d 177 *reh'g denied*, 484 U.S. 972, 108 S.Ct. 477, 98 L.Ed.2d 414 (1987). We recognize an exception to the general rule for issues of "general statewide importance," particularly if the issues do not turn on disputed evidence and do not require the court to determine additional facts. *Barrio v. San Manuel Div. Hosp. for Magma Copper Co.*, 143 Ariz. 101, 104, 692 P.2d 280, 283 (1984). Foust and RTC have stipulated to the facts needed to determine the impact of the *D'Oench* doctrine, and determining the rights of the RTC in its role as receiver for failed financial institutions is of statewide importance. For that reason, we elect to exercise our discretion to consider the *D'Oench* doctrine on appeal.

### 2.

Foust next contends that even if RTC may assert the *D'Oench* doctrine to bar his claims, other considerations prevent its application. Foust argues that section 1823(e) does not apply to claims when the parties contend that the asset at issue is invalid, *see FDIC v. Blue Rock Shopping Center*, 766 F.2d 744, 753 (3d Cir.1985), and asserts that his counterclaim involves two invalid assets: the promissory note and deed of trust on the property.

We agree with Foust that RTC may not raise the *D'Oench* doctrine as a defense when a trial court has rendered the asset at issue void or invalid. *See Olney Sav. & Loan Ass'n*, 885 F.2d at 275. That principle, however, does not assist Foust. Although he states that his counterclaim derives from the contested promissory note and deed of trust, the counterclaim actually arises from Foust's allegation that Western Savings breached its commitment to loan him money. The trial court did not void this loan commitment.[10] In fact, the jury found for Foust on the issue whether the loan commitment created an enforceable contract with Western Savings. Thus, RTC acquired a "right, title or interest" in an asset that triggers the application of *D'Oench* and section 1823(e) to Foust's counterclaim.

Next, citing *Astrup v. Midwest Fed. Sav. Bank*, 886 F.2d 1057 (8th Cir.1989) and *Vernon v. RTC*, 907 F.2d 1101 (11th Cir.1990), Foust contends that *D'Oench* and section 1823(e) bar only his contract claims and not his state tort law claims of negligent misrepresentation, fraud, and intentional interference with contract. In *Astrup*, the court held that *D'Oench* will not bar a claim of breach of fiduciary duty. *Astrup*, 886 F.2d at 1059. *Astrup* is inapposite, however, because the fiduciary duty claim arose out of a joint venture relationship between two parties and not from a secret agreement or other form of contract not reflected in bank records.

Similarly, the plaintiffs in *Vernon* sued for damages they allegedly sustained as stockholders due to the tortious actions of their savings and loan association, Old Freedom. *Vernon*, 907 F.2d at 1108. The plaintiffs alleged that Old Freedom induced their purchase of shares by misrepresentations sufficient to constitute common law fraud and to violate securities laws and RICO. *Id.* at 1103. Significantly, they did not base their claims on unrecorded agreements with Old Freedom. The court in *Vernon* refused to "extend the *D'Oench* doctrine to preserve all assets, ... from all claims tending to diminish those assets, save those claims clearly supported by the records of the insolvent bank." *Id.* at 1108.

In contrast, other courts have held that *D'Oench* and section 1823(e) bar not only breach of contract claims against the RTC, but also tort claims arising from secret agreements. *See, e.g., Langley*, 484 U.S. 86,

---

10. Additionally, the trial court entered summary judgment for Western Savings on the issue of Foust's liability on the promissory note and deed of trust. Thus, even if these assets were at issue in the counterclaim, because the trial court found the promissory note and deed of trust to be valid, RTC would still have acquired a "right, title or interest" sufficient to invoke the *D'Oench* defense and section 1823(e).

108 S.Ct. 396 (section 1823(e) bars misrepresentation and fraudulent inducement claims against bank); *Oliver v. RTC,* 955 F.2d 583, 586 (8th Cir.1992) (*D'Oench* defense bars tort claims to the extent they are based on secret agreements); *Timberland Design, Inc. v. First Serv. Bank for Sav.,* 932 F.2d 46, 50 (1st Cir.1991) (*D'Oench* bars both tort and contract claims that arise out of an alleged secret agreement); *Armstrong,* 175 Ill.Dec. at 204–05, 599 N.E.2d at 1218–19 (*D'Oench* bars tort claims based on secret oral agreements); *see also Bartram v. FDIC,* 235 Cal. App.3d 1749, 1 Cal.Rptr.2d 614, 618–19 (1991) (rejecting reasoning from both *Vernon* and *Astrup* ).

◼ The rationale for applying the *D'Oench* and section 1823(e) defenses to bar tort claims arising out of secret, unrecorded agreements is to prevent plaintiffs from circumventing the policy underlying those defenses. *Timberland Design, Inc.,* 932 F.2d at 50. This policy serves two purposes: "to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets" and to "ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms ... when a bank appears headed for failure." *Langley,* 484 U.S. at 91–92, 108 S.Ct. at 401. Plaintiffs who could rely upon secret agreements to assert tort claims that they could not assert as breach of contract claims would undermine RTC's justified reliance on bank records as reflecting considered transactions, free of fraud. We believe the better-reasoned view, and that which accords with public policy considerations, bars tort claims that arise out of secret agreements for which the bank has no record and permits those tort claims that do not arise out of such agreements.

◼ Foust's negligent misrepresentation and fraud claims arise out of Western Sav-

ings' alleged failure to honor its unrecorded agreement to loan Foust money. These claims are barred. Foust's claim of intentional interference with contract arises from his allegation that the loss of Western Savings financing caused Trunkett to cancel his purchase of the property, thereby damaging Foust. Indeed, Foust concedes that Western Savings' breach of its loan commitment provides the basis of his intentional interference claim. That claim therefore also is barred. We conclude that none of Foust's tort claims would exist but for the existence of the putative unrecorded agreement between Foust and Western Savings. The *D'Oench* doctrine and section 1823(e) therefore bar all of Foust's tort claims.[11]

**3.**

Because the *D'Oench* doctrine and 12 U.S.C. § 1823(e) bar Foust's counterclaim against RTC, we vacate the judgment in favor of Foust and remand with instructions to enter judgment for RTC on Foust's counterclaim.

### III. FOUST'S CROSS–APPEAL

Foust asserts that the trial court erred in granting summary judgment in favor of Western Savings on its claim that Foust was liable under the terms of the promissory note. We agree that material issues of fact remain and preclude summary judgment and therefore reverse the order entering judgment for Western Savings.

**A.**

In November 1985, Western Savings loaned Foust and Fred Andrews $238,000, in return for which they signed a personal promissory note holding them jointly and severally liable. The note was due on May 20, 1986. Western Savings initially secured the note with deeds of trust on Foust's and

---

11. In his brief on appeal, Foust summarily asserts that applying the *D'Oench* doctrine to bar his claims violates his rights under the fifth, seventh and fourteenth amendments to the United States Constitution. For support, Foust cites only *Coit Independence Joint Venture v. FSLIC,* 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989). In *Coit,* the Supreme Court, considering

FIRREA's predecessor statute, held that Congress did not grant the FSLIC exclusive adjudicatory authority over state law claims asserted against failed savings and loan associations. The decision applies neither to *D'Oench,* itself a Supreme Court doctrine, nor to section 1823(e). We find no merit in this argument.

Andrews' homes, and later replaced the lien on Foust's home with a lien on the Pinnacle Peak property. On June 17, 1986, Foust and Andrews signed a modification agreement that reflected an outstanding principal balance of $223,000, extended the payoff date to March 16, 1987, and required quarterly interest payments.

On December 8, 1986, Western Savings wrote Foust a letter agreeing to release the lien on the property in return for payment of $112,500. On March 11, 1987, Cameron, acting on behalf of Western Savings, sent a letter to American Title Insurance stating that the payoff amount on the "Foust property" was $223,000, plus interest. On that same date, Western Savings executed a Deed of Full Release and Full Reconveyance (the Release) on the property. On March 30, 1987, Cameron sent a second letter to American Title stating that the new payoff figure for Foust's property was $111,500, "principal for Foust," plus interest. In the letter, Cameron requested that American Title "not record our release and reconveyance until you can submit the full payoff amount to Western Savings."

In March, Andrews made an interest payment as required under the modification agreement. Then, on May 12, 1987, Foust paid Western Savings $125,446.91. In return, Western Savings released the deed of trust on the Pinnacle Peak property. On June 1, 1987, Andrews signed another extension and modification agreement with Western Savings for the outstanding principal balance of $111,500, the amount remaining after Foust's payment, and received a reimbursement of approximately $5,220 for his previous interest payment, allegedly out of Foust's May 12th payment. Foust refused to sign the modification agreement, contending that his May payment extinguished his obligation.

On August 25, 1987, Western Savings filed suit against Foust and Andrews to recover the remaining amount on the promissory note, alleging the note was in default as of March 16, 1987, and that Foust and Andrews were jointly liable on the note. Western Savings filed a motion for summary judgment against both Foust and Andrews on October 27, 1988. In a March 14, 1989 minute entry, the trial court granted summary judgment for Western Savings on its claim on the promissory note, but instructed Western Savings not to include language from Rule 54(b), Arizona Rules of Civil Procedure, in the order. On April 13, 1989, Andrews filed a motion seeking reconsideration of the order granting summary judgment, which the court denied. Foust neither joined in Andrews' motion nor filed a supporting motion. After the jury trial, Foust moved for reconsideration of the order granting summary judgment, citing evidence admitted at trial that he alleged precluded summary judgment. The trial court denied Foust's motion by minute entry on December 12, 1989. Foust filed this cross-appeal on March 5, 1990, requesting reversal of summary judgment.

### B.

Foust argues that the evidence before the trial court when it considered Western Savings' motion for summary judgment raises material issues of fact as to Foust's liability for the remaining unpaid balance of the loan. If such issues exist, the trial court should not have entered summary judgment:

> "Summary judgment is appropriate where the record shows that there is no genuine dispute as to any material fact, that only one inference can be drawn from those facts, and that based upon the facts, the moving party is entitled to judgment as a matter of law." ... If there are material facts upon which reasonable people could reach different conclusions, summary judgment is inappropriate.

*Nelson v. Nelson,* 164 Ariz. 135, 137, 791 P.2d 661, 663 (App.1990) (citations omitted). We will view the facts in the light most favorable to the party against whom summary judgment was entered. *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 388, 710 P.2d 1025, 1043 (1985); *Zuck v. State,* 159 Ariz. 37, 39, 764 P.2d 772, 774 (App.1988).

Foust contends that language in the Release, concededly executed by Western Savings, indicates that Western Savings intended to discharge Foust's debt when it accepted his payment in May 1987. Foust specifically refers to language in the Release

**522**

that states: "WHEREAS, the Deed of Trust executed by Kenneth A. Foust, Trustor(s), to WESTERN SAVINGS AND LOAN ASSOCIATION, ... *together with the debt thereby secured is fully paid, satisfied and discharged....*" (Emphasis added.) He contends that language, considered with Western Savings' December 8, 1986 letter to Foust offering to release the lien for $112,-500.00, Cameron's two letters to American Title that adjusted the principal amount due for release of Foust's lien, and Foust's sworn affidavit, which states his understanding that Western Savings had released the lien on the property when he paid the $125,446.91, are sufficient to permit a reasonable person to infer that Western Savings had promised Foust that his May 1987 payment would release his liability on the note and that both intended that result.

We agree that a reasonable person, considering the evidence available to the trial court during summary judgment proceedings in the light most favorable to Foust, could infer that Western Savings intended to extinguish Foust's debt under the promissory note when it accepted his payment in May 1987. We therefore reverse the trial court's order granting summary judgment in favor of Western Savings and remand for further proceedings consistent with this opinion.

### IV. CONCLUSION

We hold that the appointment of RTC as receiver/conservator of Western Savings did not automatically divest the state court of subject matter jurisdiction over this action, which was filed prior to receivership or conservatorship. We vacate the verdict in favor of Foust on his counterclaim against RTC because the *D'Oench* doctrine and 12 U.S.C. § 1823(e) bar Foust's claims. We remand with instructions to the trial court to enter judgment for RTC on Foust's counterclaim. Finally, we reverse the trial court's order granting summary judgment in favor of Western Savings with regard to its claim against Foust on the unpaid promissory note.

GERBER, P.J., and TOCI, J., concur.