323 P.3d 1200

**Alan KORWIN and Trainmeaz, LLC, Plaintiffs/Appellants,**

v.

**Debbie COTTON and City of Phoenix, Arizona, a municipal corporation and political subdivision of the State of Arizona, Defendants/Appellees.**

No. 1 CA–CV 12–0878.

Court of Appeals of Arizona, Division 1.

May 8, 2014.

Goldwater Institute, Scharf–Norton Center for Constitutional Litigation By Clint Bolick, Christina Sandefur, Phoenix, Counsel for Plaintiffs/Appellants.

Udall Shumway PLC By Bradley D. Gardner, David R. Schwartz, Mesa, Counsel for Defendants/Appellees.

ACLU Foundation of Arizona By Daniel Joseph Pochoda, Kelly J. Flood, Phoenix, Co–Counsel for Amicus Curiae ACLU Foundation of Arizona.

Quarles & Brady LLP By Isaac M. Gabriel, Sarah R. Anchors, Krystal Aspey Fleischmann, Benjamin C. Nielsen, Phoenix, Co–Counsel for Amicus Curiae ACLU Foundation of Arizona.

## OPINION

JONES, Judge.

¶ 1 Alan Korwin and TrainMeAZ, L.L.C., an Arizona company Korwin owns and manages (collectively, "Appellant"), appeal the superior court's grant of summary judgment in favor of the City of Phoenix and Debbie Cotton, the City's Public Transit Director (collectively, "City"), upholding the constitutionality of city regulations pertaining to advertising on its bus system. Because the City unconstitutionally applied its Transit Advertising Standards to Appellant's advertisement, we reverse the judgment in favor of the City and direct the superior court to enter summary judgment in favor of Appellant.

### FACTS AND PROCEDURAL HISTORY

¶ 2 The City operates a proprietary bus system through its Public Transit Department. The bus system includes hundreds of buses and benches as well as thousands of bus shelters. The City sells advertising space within and upon its buses as well as upon its benches and bus shelters but, by regulation, only accepts advertisements that propose a commercial transaction. The City sells the advertising space to generate revenue, and competes with other forms of public and nonpublic transportation for those revenues.

¶ 3 Appellant is an Arizona for-profit company dealing in marksmanship training, gun safety classes, and ancillary supplies and books. Appellant maintains a website and serves as an umbrella organization for the firearms industry in Arizona. In addition, Appellant receives financial support from commercial entities that serve as contribut-

ing sponsors. In October 2010, Appellant sought to advertise its website on the City's bus shelters.

¶ 4 Appellant entered into an agreement with a third party that sold advertising space for the City's bus shelters to post 6′ X 4′ advertisements on fifty of the City's bus shelters. The vendor [1] agreed to post the advertisement without having previously submitted Appellant's advertisement to the City for review. Appellant's advertisement contained a drawing of a large red heart, bordered by the following paragraphs, displayed in small print:

> In Arizona, marksmanship matters. "The Train–Me State" knows that a nation, trained to arms, is an American linchpin of freedom, and is respected in Arizona like nowhere else. The Arizona legislature has enacted vibrant protection of the Second Amendment right to keep and bear arms. We in Arizona seem destined to set models for the nation—in this case, a shining example of gun rights for all free peoples of the earth.

> The Grand Canyon State has Constitutional Carry. This frees any law-abiding adult here—not just residents—to discreetly enjoy the right to bear arms envisioned in the Constitution. WE [sic] have a super-strong Castle Doctrine, coupled with [a] robust burden of proof, a defensive-display statute, statewide preemption law restricting local fiefdoms from gun-rights abuse, and a specious-lawsuit ban—a true milestone—protecting honest people from false charges by criminals and their kind. We even have a High School Marksmanship law on the books for one credit towards a diploma; now if we can just move the obstructionists out of the way. Our Arizona Firearms Freedom Act joins a growing nationwide movement to repel federal incursion on states' rights, and end intolerable abuse of the interstate Commerce Clause. TrainMeAZ is a non-partisan, joint educational effort of the firearms community.

1. All advertising submitted to the vendor was subject to the City's 2009 Transit Advertising Standards ("2009 Standards"). Once the vendor received a proposed advertisement from a prospective customer, it was obligated, in turn, to submit the advertisement to the City for review.

The TrainMeAZ Campaign is designed to teach and bring gun safety and knowledge to every Arizonan. In this state, we take it for granted that you know how to shoot, know how to handle guns safely, how to use guns for self defense and all legal purposes, and that you know and respect our laws. Criminals with guns receive harsh punishment, so be it. Citizens with guns earn respect, and help keep Arizona a safe and wonderful place to live. Robert Heinlein correctly noted that an armed society is a polite society, and in Arizona this is truth personified and exercised. Come to an "Open Carry Banquet," and see! Join the Arizona buy-cott. See how we do it at azcdl.org and asrpa.com and for our sisters in arms, 2asisters.org. Go to TrainMeAZ.com, download this statement, learn how you can participate and improve your skills.

This is why the TrainMeAZ Campaign exists. Acting as one, the state rises up to encourage and enable gun-safety training, fun shoots, special training days at the range, a coordinating point for the state's thousand-plus certified trainers—with a web-interactive and printed maps for the people. Soak up family days where the shooting sports are honored and enjoyed, with that freedom smell of gunpowder and a good hot dog. Arizona is an American protectorate of the culture of marksmanship, where the decent, honorable and lawful pursuit of the shooting sports, and the precious right to keep and bear arms is honored and enjoyed. How do you think so many trainers and shooting schools thrive here? Should your state honor our rights this way?

Visit Arizona, and breathe free air. Come experience *"The Litmus Test of Freedom"* the right you have as an honest adult to enjoy your right to arms.

Use TrainMeAZ.com website to find training opportunities, shooting ranges, and classes for any level of skill—from your first-time shooting experience (a thrill you will always remember, just like the rest of us do), to the kind of tactical training the world's elite special forces get—an experience few of us get to experience. In Arizona, marksmanship matters. Learn to shoot straight. Teach your children well.

Join us, as a nation trained to arms, confident in our exercise of the Second Amendment right of the people to keep and bear arms, which shall not be infringed. Exercising liberty's teeth has a positive impact on the political environment.

TrainMeAZ is sponsored by:

Arizona Citizens Defense League ● Arizona State Rifle and Pistol Association ● Caswells Crossroads of the West Gun Shows ● Front Sight ● GalleryofGuns.com ● GunLaws.com ● Gunsite Second Amendment Sisters ● Wide World of Maps

¶ 5 Once the advertisement came to the attention of the City, and after consulting legal counsel, the City determined it did not comply with the City's 2009 Standards as it contained noncommercial elements and failed to "propose a commercial transaction." The City then removed Appellant's advertisements from the bus shelters.

¶ 6 Appellant objected and the parties attempted to settle their dispute to the point of the City preparing and proposing a replacement advertisement. Ultimately, however, Appellant and the City were unable to reach agreement. As a result, in May 2011, Appellant sued the City, seeking declaratory and injunctive relief under the First Amendment of the U.S. Constitution and Article II, Section 6 of the Arizona Constitution. Appellant also raised due process and equal protection claims pursuant to the Fourteenth Amendment of the U.S. Constitution and Article II, Sections 4 and 13 of the Arizona Constitution.

¶ 7 Although the original complaint challenged only the 2009 standards, which were in effect at the time Appellant's advertisement was rejected, Appellant later amended its complaint to allege that the transit advertising standards the City adopted in March 2011 ("2011 Standards") were also unconstitutionally vague and would allow for arbitrary enforcement. After discovery, the parties cross-moved for summary judgment. The trial court denied Appellant's motion and granted summary judgment in favor of the City. Appellant timely appealed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution and Arizona Revised

Statutes ("A.R.S.") sections 12–120.21(A)(1) (2014)[2] and –2101(A)(1) (2014).

## STANDARD OF REVIEW

¶8 We review the grant of summary judgment on the basis of the record made in the trial court. *Schwab v. Ames Constr.*, 207 Ariz. 56, 60, ¶17, 83 P.3d 56, 60 (App.2004). "[W]e determine de novo whether any genuine issues of material fact exist and whether the trial court properly applied the law. We view the facts and inferences drawn from those facts in the light most favorable to the party against whom judgment was entered." *Maxfield v. Martin*, 217 Ariz. 312, 314, ¶11, 173 P.3d 476, 478 (App. 2007) (internal citations omitted). Our review of the constitutionality of the City's Transit Advertising Standards is also de novo. *Salib v. City of Mesa*, 212 Ariz. 446, 450, ¶4, 133 P.3d 756, 760 (App.2006).

## DISCUSSION

### I. The First Amendment.

¶9 The U.S. Supreme Court has adopted a so-called forum analysis "as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interests of those wishing to use the property for other purposes." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *see Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Under this analysis, the extent to which the government can control access to a particular forum depends upon the nature of the forum. *Cornelius*, 473 U.S. at 800, 105 S.Ct. 3439; *Perry Educ. Ass'n*, 460 U.S. at 44, 103 S.Ct. 948.

### A. Consideration of Arizona's Constitutional Speech Protections.

¶10 Appellant's summary judgment argument in the superior court was premised solely upon the First Amendment and application of the U.S. Supreme Court's forum analysis. On appeal, Appellant, joined by *amicus curiae*, now argues we should not decide the issues presented here under the First Amendment and the U.S. Supreme Court's forum analysis but instead should decide these issues under the Arizona Constitution; specifically, Article 2, Section 6, which states: "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."

¶11 The test for determining the constitutionality of "content-based secondary effects regulations" restricting speech, under Article 2, Section 6, was enunciated in *State v. Stummer*, 219 Ariz. 137, 194 P.3d 1043 (2008). Under *Stummer*, the City would be required to demonstrate: (1) the content-based regulation is not directed at suppressing protected speech, but rather at ameliorating the negative secondary effects of the regulated speech; and (2) "the regulation does not sweep too broadly." 219 Ariz. at 144, ¶24, 194 P.3d at 1050. In the first phase, the enacting body must demonstrate it had a reasonable basis for believing the regulated speech "created negative secondary effects greater than those created by speech generally and that the regulation would address those effects." *Id.* at ¶26, 194 P.3d at 1050. The second phase requires the enacting body to demonstrate it "has a substantial [government] interest, that the regulation significantly furthers that interest, and that the challenged regulation does not unduly burden speech." *Id.* at 145, ¶27, 194 P.3d at 1051.

¶12 The City, however, argues Appellant waived this argument by not raising it in the trial court. *See Odom v. Farmers Ins. Co. of Ariz.*, 216 Ariz. 530, 535, ¶18, 169 P.3d 120, 125 (App.2007) ("Generally, arguments raised for the first time on appeal are untimely and deemed waived."). We agree.

¶13 The policies and purpose behind declining to address matters raised for the first time on appeal are particularly germane here, as the test Appellant proposes would require additional fact-finding not engaged in by the trial court and which is therefore absent from the record on appeal. *See Resolution Trust Corp. v. Foust*, 177 Ariz. 507, 518, 869 P.2d 183, 194 (App.1993) ("In Arizona, appellate courts generally will not re-

---

**2.** Absent material revisions after the relevant    date, we cite to the current version of a statute.

view issues not argued or factually established in the trial court."). Appellant had a full and fair opportunity to develop that record and press its argument under the Arizona Constitution in the trial court and did not do so. Accordingly, we decline to address Appellant's arguments under the Arizona Constitution.

**B. Forum Analysis.**

¶ 14 In traditional forum analysis, expressive activity occurring in "traditional public fora," such as streets or parks, receives the greatest protection from state limitations on speech. *See Perry Educ. Ass'n,* 460 U.S. at 45, 103 S.Ct. 948; *United States v. Kokinda,* 497 U.S. 720, 726, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). Even in a second category of public property—where the government intentionally designates or makes public property available for expressive activity[3]—content-based restrictions on speech must serve a compelling state interest and be narrowly drawn. *Perry Educ. Ass'n,* 460 U.S. at 45–46, 103 S.Ct. 948.

¶ 15 We deal here with a third category of fora—"nonpublic fora"—property owned by and under the control of the government, and "which is not by tradition or designation a forum for public communication." *Id.* at 46, 103 S.Ct. 948. Underlying the concept of a nonpublic forum are two principles: first, the government, like a private owner of property, "has power to preserve the property under its control for the use to which it is lawfully dedicated," and second, "the First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Id.* at 46, 103 S.Ct. 948 (quoting *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'n,* 453 U.S. 114, 129–30, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981)). The government may place regulations on speech within a nonpublic forum so long as the regulations are reasonable and viewpoint neutral. *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439; *Perry Educ. Ass'n,* 460 U.S. at 46, 103 S.Ct. 948.

¶ 16 A bus system owned and operated by a city is proprietary in nature and therefore treated as a nonpublic forum for First Amendment analysis. *See Cornelius,* 473 U.S. at 804, 105 S.Ct. 3439 (stating the "[*Lehman v. City of Shaker Heights* ] Court found that the [City of Shaker Heights'] use of the property as a commercial enterprise was inconsistent with an intent to designate the [city's transit buses] as a public forum"); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 303–04, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (differentiating the city transit system from a public forum and stating, "No First Amendment forum is here to be found."); *Uptown Pawn & Jewelry, Inc. v. City of Hollywood,* 337 F.3d 1275, 1278–79 (11th Cir.2003). Indeed, in a prior challenge to advertising restrictions adopted by the City of Phoenix, the Ninth Circuit Court of Appeals held the exterior panels of the City's buses were nonpublic fora for purposes of the First Amendment. *Children of the Rosary v. City of Phx.,* 154 F.3d 972, 978 (9th Cir.1998). As the Ninth Circuit noted in that case, the City, having consistently prohibited political and religious advertising on its buses, had preserved the panels as a nonpublic forum. *Id.* at 976–78 ("[T]he city of Phoenix consistently promulgates and enforces policies restricting advertising on its buses to commercial advertising. The city has not designated the advertising space on the exterior of its buses as a place for general discourse, and we therefore do not back away from our conclusion that the advertising space is a nonpublic forum."). While this Court is not bound by *Children of the Rosary*'s holding, we agree that advertising space afforded by the City's bus system constitutes nonpublic fora. *Children of the Rosary,* 154 F.3d at 977–78. As credited to Justice Brandeis, and placed in context by Justice Douglas:

> Buses are not recreational vehicles used for Sunday chautauquas as a public park might be used on holidays for such a purpose; they are a practical necessity for millions in our urban centers. I have al-

---

**3.** This second category of public property is often referred to as a "designated public forum." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) ("The second category of public property is the designated public forum ... property that the State has opened for expressive activity by part or all of the public").

ready stated this view in my dissent in *Public Utilities Comm'n v. Pollak*, 343 U.S. 451, 469 [72 S.Ct. 813, 96 L.Ed. 1068 (1952) ] . . .: "One who tunes in on an offensive program at home can turn it off or tune in another station, as he wishes. One who hears disquieting or unpleasant programs in public places, such as restaurants, can get up and leave. But the man on the streetcar has no choice but to sit and listen, or perhaps to sit and to try not to listen." There is no difference when the message is visual, not auricular. In each, the viewer or listener is captive.

*Lehman*, 418 U.S. at 307, 94 S.Ct. 2714.

## II. The Scope of the Nonpublic Forum Within the City's Bus System.

¶ 17 While *Children of the Rosary* addressed, as nonpublic fora, only the exterior advertising panels on the City's buses, it is self-evident that bus benches and shelters are likewise an essential part of the proprietary bus business, and the City's regulation of the advertisements placed upon them should be subject to the same First Amendment principles. *See Uptown Pawn & Jewelry*, 337 F.3d at 1279–80 (concluding bus benches owed by the City of Hollywood are a nonpublic forum). Given the commonality of users between buses, bus benches and bus stops, we find that beyond the exterior panels of the City's buses, bus benches and bus shelters, themselves, are also nonpublic fora.

## III. The City's Alleged Abandonment of the Nonpublic Forum.

¶ 18 Appellant, however, asserts the City has failed to preserve the nonpublic forum status of the bus shelters by inconsistently applying the Transit Advertising Standards. *See Hopper v. City of Pasco*, 241 F.3d 1067, 1076 (9th Cir.2001) ("Thus, consistency in application is the hallmark of any policy designed to preserve the non-public status of a forum."). We disagree.

¶ 19 Whether a nonpublic forum has been created depends on the government's intent. *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439 (stating the government does not create a public forum through inaction or

by permitting limited discourse, "but only by intentionally opening a nontraditional public forum for public discourse. Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum."). Applying that principle, a government may abandon nonpublic forum status if it does not enforce the standards it has created to regulate expression in the forum. *See Hopper*, 241 F.3d at 1076 ("A policy purporting to keep a forum closed (or open to expression only on certain subjects) is no policy at all for purposes of public forum analysis if, in practice, it is not enforced or if exceptions are haphazardly permitted."). What ultimately matters is whether the government consistently enforces the policy restrictions it adopted regarding the use of a particular forum. *Id.* at 1075.

¶ 20 Although the City must consistently enforce its Transit Advertising Standards, it does not waive the opportunity to regulate advertising within its bus system by failing to exercise absolute and inerrant consistency in its application of those Standards to the wide variety of advertisements it receives. Even though Appellant proffers several advertisements, which it believes demonstrate the City has abandoned the Standards, there is no indication the City has allowed any advertisement to be posted without reviewing it pursuant to the Standards or that the City accepted an advertisement believing it to be inconsistent with the Standards. Accordingly, upon this record, we find the City has not abandoned the bus shelters' status as nonpublic fora.

## IV. Permissible Regulation of Speech in Nonpublic Fora.

¶ 21 The government may impose reasonable restrictions upon speech within a nonpublic forum as long as the restrictions are not based upon the speaker's point of view. *Int'l Soc. for Krishna Consciousness*, 505 U.S. at 678–79, 112 S.Ct. 2701; *Perry Educ. Ass'n*, 460 U.S. at 46, 103 S.Ct. 948.[4] Although viewpoint-based limitations are not

---

4. Appellant does not argue the City rejected the advertisement due to its viewpoint—advocating for gun rights. In fact, at oral argument before

this Court, Appellant admitted the City's refusal to allow its advertisement was not aimed at suppressing the advertisement's viewpoint.

permitted, fundamental to the notion of a nonpublic forum is that the government may limit speech based upon its subject matter. As enunciated in *Perry Education Association:*

> Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property.

460 U.S. at 49, 103 S.Ct. 948. The touchstone for determining the constitutionality of restrictions on speech in a nonpublic forum is whether they are reasonable in light of the purpose of the forum. *Id.* As the proprietor of the bus system, the City is entitled "to develop and make reasonable choices concerning the type of advertising" it chooses to display, and may take steps necessary to avoid controversy or the perception of favoritism. *Lehman,* 418 U.S. at 303–04, 94 S.Ct. 2714.

## V. The City's Transit Advertising Standards.

¶ 22 Since 1996, the City has permitted commercial advertising on its buses, bus shelters, and benches. The 2009 Standards stated, in pertinent part, "The subject matter of transit bus, shelter, and bench advertising shall be limited to speech which proposes a commercial transaction." [5] The City amended that provision in March 2011 by eliminating the "shall be limited to" provision and adding a requirement that a "commercial transaction must be proposed and must be adequately displayed on the transit advertising panel." [6]

---

5. The full text of the 2009 Standards is as follows:

 A. The public Transit Director, or his/her designee, shall reject advertising that does not comply with the standards set forth in subparagraph C) [sic].

 B. The subject matter of transit bus, shelter, and bench advertising shall be limited to speech which proposes a commercial transaction.

 C. The following standards for advertising have been adopted and advertising copy may not be displayed which:
 1. Is false, misleading or deceptive
 2. Relates to an illegal activity
 3. Is explicit sexual material, obscene material, or material harmful to minors as these terms are defend in Title 13, Chapter 35, A.R.S.
 4. Advertises tobacco products
 5. Advertises beer, wine and/or alcohol products: on the exterior or interior of Phoenix Neighborhood Circulator vehicles; on the interior of any transit vehicle; or in instances in which transit furniture is located less than 600 feet near a school or church
 6. Depicts violence and/or anti-social behavior
 7. Includes language which is obscene, vulgar, profane or scatological
 8. Relates to instruments, devices, items, products or paraphernalia which are designed for use in connection with "specified sexual activity" as defined in the City of Phoenix Zoning Ordinance

6. The full text of the 2011 Standards is as follows:

 A. It is the intent of the City that all transit advertising panels on city buses and on transit furniture are non-public forums and are to be set aside for commercial advertisements or for transit information as provided by the City. The City's primary purpose for the transit advertising panel is generating revenue.

 B. It is a guideline of the City of Phoenix Public Transit Department that no advertising will be accepted for use on any city bus or transit furniture that does not comply with the following standards:
 1. A commercial transaction must be proposed and must be adequately displayed on the transit advertising panel.
 2. The advertising may not:
 a. Be false, misleading, or deceptive.
 b. Relate to an illegal activity.
 c. Advertise or depict the use of tobacco or smoking products.
 d. Advertise or depict the use of *spirituous liquor* as [defined in A.R.S. § 4–101]:
 i. On the exterior or interior of Phoenix neighborhood Circulator and Reserve–a–Ride vehicles,
 ii. On the interior of any transit vehicle.
 iii. On transit furniture that is located less than 600 feet from a church or similar structure of worship, or school building.
 e. Represent, by language or graphics, violence or anti social behavior.
 f. Advertise or depict language, gestures, conduct, or graphical representations that are obscene, pornographic, vulgar, profane, or scatological.
 g. Represent, by language or graphics, a *nude* or *seminude* person, as those terms are defined in Section 11–821, Arizona Revised Statutes [now § 11–811], or the exposed buttocks of any person.
 h. Depict, relate to, or reference a website or other medium that relates to *specifi[c]*

¶ 23 Appellant alleges that by allowing only advertisements that were limited to proposing commercial transactions, the 2009 Standards constituted a content-based restriction on speech that was, on its face, unconstitutionally vague and allowed for arbitrary enforcement. Appellant also alleges the City had applied the 2009 Standards arbitrarily by rejecting the advertisement even though the advertisement had proposed the requisite commercial transaction. In its motion for summary judgment, Appellant argued the 2009 and 2011 Standards were both unconstitutional on their face and as applied.

¶ 24 In its motion for summary judgment, the City asserted Appellant's advertisement failed to comply with the 2009 Standards and the 2011 Standards, which the City adopted after the City rejected Appellant's advertisement but just before the commencement of the litigation. Addressing both the 2009 and 2011 Standards, the trial court ruled the City could constitutionally limit transit advertising to advertisements that proposed a commercial transaction and that the advertising standards were not unconstitutionally vague. It also found Appellant had failed to "come forward with sufficient facts to create a triable issue" in regard to Appellant's assertion that the City arbitrarily applied the standards.

¶ 25 On appeal, Appellant limits its arguments to the 2011 Standards, contending the requirement that an advertisement propose a commercial transaction that is "adequately displayed" is facially vague and thus grants unbounded discretion to City officials to determine whether a commercial advertisement is proposed and adequately displayed. Appellant argues in the alternative that, even if not facially unconstitutional, the 2011 Standards were applied to its advertisement in an arbitrary manner.[7]

## VI. Appellant's Facial Challenge to the "Adequately Displayed" Provision.

¶ 26 Appellant challenges the City's requirement that a commercial transaction must be "adequately displayed" as unconstitutional on its face. When such a standard implicates First Amendment rights, the challenger has the burden to show that standard will lead to a "substantial number" of unconstitutional applications. *New York v. Ferber*, 458 U.S. 747, 769–71, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982); *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir.2006) ("[A] party must show, at a minimum, that the challenged law would be vague in the vast majority of its applications; that is, that 'vagueness permeates the text of [the] law.' ") (quoting *City of Chi. v. Morales*, 527 U.S. 41, 55, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)).

¶ 27 In support of its facial challenge, Appellant offered a handful of advertisements submitted to the City by other advertisers and challenged whether each "adequately displayed" a commercial transaction. Appellant posits that the City accepted several of those advertisements even though the advertisements did not appear to propose a commercial transaction. Appellant further asserts that these examples illustrate that advertisers of ordinary intelligence are unable to understand the meaning of the phrase "adequately displayed," thereby proving the phrase is unconstitutionally vague and the City's application of the standards is necessarily arbitrary.

¶ 28 We are not persuaded that the City's prohibition of advertisements that do not "adequately display" a proposed commercial transaction is "vague in the vast majority of its applications" or that it precludes a "substantial number" of otherwise permissible advertisements. Although Appellant cites a handful of examples of arguably "close calls,"

---

*sexual activities* or *specifi[c] anatomical areas* as those terms are defined in Section 11–821, Arizona Revised Statutes [now § 11–811].

7. Although Appellant did not re-submit its ad for review under the 2011 Standards, the City stated it would have rejected Appellant's advertisement under those standards as well. At the implied invitation of the parties, rather than require Appellant to perform the futile act of resubmitting its advertisement to the City for review pursuant to the 2011 Standards, we will proceed on that assumption. Moreover, since any argument under the 2009 Standards is moot (Appellant's complaint sought only injunctive relief rather than damages), we will focus our attention on the 2011 Standards rather than the standards in effect in 2009.

we have no reason to believe the City's requirement precludes a substantial number of commercial advertisers from using advertising space on the City's bus system. Appellant's examples, in and of themselves, do not indicate the City arbitrarily or capriciously applied the phrase "adequately display" in the vast majority of its applications. Nor do Appellant's examples demonstrate the City has accepted, in other situations, advertisements that blend ideological or political speech with a commercial message as occurs in Appellant's rejected advertisement.

¶ 29 Moreover, the 2011 Standards are not unconstitutionally vague as viewed in their entirety; they require the advertising be commercial. Indeed, the 2011 Standards adopt the very language applied by the U.S. Supreme Court in identifying commercial speech: that the advertisement must "propose a commercial transaction." *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 473–74, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); *Children of the Rosary*, 154 F.3d at 983.

¶ 30 Appellant's advertisement juxtaposes a large volume of political, noncommercial speech against language that arguably proposes a commercial transaction.[8] We must assume that, by contrast, the typical commercial advertisement is focused not on political speech but on a commercial transaction. Appellant's facial challenge to the City's regulation fails because the statute is clearly valid "in the vast majority of its intended applications." *Hill v. Colorado*, 530 U.S. 703, 733, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (quoting *United States v. Raines*, 362 U.S. 17, 23, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960)).

¶ 31 Therefore, we reject Appellant's facial challenge to the constitutionality of the 2011 Standards.

## VII. Appellant's "As–Applied" Challenge to the City's 2011 Standards.

¶ 32 An "as-applied" challenge assumes the standard is otherwise constitutionally valid and enforceable, but argues it has been applied in an unconstitutional manner to a particular party. *Boddie v. Connect-*icut, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *see Dahnke–Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289, 42 S.Ct. 106, 66 L.Ed. 239 (1921) (noting a statute may be "invalid as applied to one set of facts and yet valid as applied to another"). Appellant argues the 2011 Standards are unconstitutional as applied to its advertisement because the advertisement adequately displayed a proposed commercial transaction in compliance with the standard. We agree.

¶ 33 As relevant here, the only two requirements of the 2011 Standards are that a "commercial transaction be proposed and must be adequately displayed." The City asserts that a "commercial transaction," within the meaning of the standard, is an "exchange of goods or services for something of value." The City further asserts that a commercial transaction is proposed through an advertisement's "essential elements including copy, words, graphics, pictorials, color, and design." Moreover, the City asserts a commercial transaction is adequately displayed when a "reader should reasonably be able to determine from the graphics and wording that a product or service would be proposed to them in the advertisement. Adequate is synonymous with sufficiently. A proposed transaction should not be hidden."

¶ 34 Although Appellant's advertisement clearly contains a number of noncommercial statements, it comports with the first provision of the 2011 Standards requiring that it propose a commercial transaction. As clarified during oral argument in this Court, however, the City contends that the commercial transaction in Appellant's advertisement is not "adequately displayed" because the scope of the advertisement is not *limited to* that commercial transaction. Not only is that application of the 2011 Standards inconsistent with the specific language of the 2011 Standards, it flies in the face of the City's presumably considered decision to remove the words "limited to" from the 2009 Standards and replace them with the requirement that an advertisement only "adequately display" a proposed commercial transaction.

---

8. According to the City, "The difference between the [Appellant's advertisement] ... and every other ad, is the political diatribe extolling the great virtues [of Second Amendment gun-ownership rights]."

Unlike the more exacting 2009 Standards, which might have disallowed an advertisement whose language did anything beyond propose a commercial transaction, the 2011 Standards permit a "blended" advertisement, permitting an advertisement that, of necessity must include, but is not limited to, a commercial transaction.

¶ 35 A general presumption in statutory construction is that "when [government] alters the words of a statute, it must intend to change the statute's meaning." *United States v. Wilson*, 503 U.S. 329, 336, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992). The language of the 2009 Standards unequivocally required that an advertisement be "limited to" a commercial transaction; the 2009 Standards thereby paralleled the established definition of purely commercial speech that does "no more than propose a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). We construe the phrase "limited to" to have meant that each and every aspect of an advertisement was required to directly relate to the requisite commercial proposal.

¶ 36 By contrast, fairly read, by requiring only that the commercial transaction be "adequately displayed," the 2011 Standards require only that the commercial purpose not be *inadequately* or *insufficiently* displayed. This is particularly apparent given the City's decision to delete the "limited to" language of the City's 2009 Standards in favor of the "adequately displayed" language of the 2011 construct. The City's contention that Appellant's advertisement fails the 2011 Standards because it is not "limited to" a commercial transaction is nowhere supported by the language of the 2011 Standards or by the rule that we must presume meaningful intent in the City's removal of the "limited to" requirement when the standards were amended in 2011. Contrary to the City's contention, the 2011 Standards must be interpreted as allowing content in addition to a proposed commercial transaction, as long as the commercial transaction remains "adequately displayed."

¶ 37 Because we accept the City's concession—that it would reject Appellant's advertisement under the 2011 Standards because the advertisement is not "limited to" a proposed commercial transaction—we deem the 2011 Standards unconstitutional as applied to Appellant's advertisement.[9] Accordingly, we enjoin the City from rejecting Appellant's advertisement and, consistent with our denial of Appellant's facial challenge, we leave in place the City's 2011 Standards. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force.").

## CONCLUSION

¶ 38 Based upon the foregoing, we reverse the trial court's granting of summary judgment in favor of the City, and remand to the trial court for entry of judgment enjoining the City from rejecting Appellant's advertisement under the 2011 Standards.

9. As we find Appellant's First Amendment rights were violated, and reverse on that ground, we need not reach Appellant's due process or equal protection arguments.