IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**APRIL SMITH, ET AL.,**
*Plaintiffs/Appellants,*

*v.*

**ADRIAN FONTES, ET AL.**
*Defendants/Appellees,*

---

**MAKE ELECTIONS FAIR PAC,**
*Real Party in Interest.*

---

No. CV-24-0222-AP/EL
Filed August 6, 2025

---

Appeal from the Superior Court in Maricopa County
The Honorable Frank W. Moskowitz, Judge
Nos. CV2024-019846
CV2024-019880
(Consolidated)
**AFFIRMED**

---

COUNSEL:

Roy Herrera, Daniel A. Arellano, Jane W. Ahern, Austin T. Marshall, Herrera Arellano LLP, Phoenix, Attorneys for April Smith, Nira Lee, and Joshua Davidian

Andrew Gould, Drew C. Ensign, Dallin B. Holt, Brennan A.R. Bowen, Daniel Tilleman, Holtzman Vogel Baran Torchinsky & Josefiak PLLC, Phoenix, Attorneys for Arizona Free Enterprise Club, Susan Garvey, Kathleen Liles, and John Shadegg

Kristin K. Mayes, Arizona Attorney General, Kara Karlson, Karen J. Hartman-Tellez, Kyle Cummings, Assistant Attorneys General, Phoenix, Attorneys for Adrian P. Fontes

Brunn (Beau) W. Roysden III, Katlyn J. Divis, Fusion Law, PLLC, Phoenix, Attorneys for Warren Petersen and Ben Toma

Mary R. O'Grady, Andrew G. Pappas, Travis C. Hunt, Emma Cone-Roddy, Osborn Maledon, P.A., Phoenix, Attorneys for Make Elections Fair PAC

Timothy Sandefur, Scharf-Norton Center for Constitutional Litigation, Phoenix, Attorney for Amicus Curiae Goldwater Institute

Stephen W. Tully, Tully Bailey, LLP, Scottsdale, Attorneys for Amicus Curiae Stephen I. Richer

Kristin K. Mayes, Arizona Attorney General, Hayleigh S. Crawford, Nathan T. Arrowsmith, Joshua G. Nomkin, Assistant Attorneys General, Phoenix, Attorneys for Amicus Curiae Arizona Attorney General's Office

Joseph Kanefield, Charlene A. Warner, Snell & Wilmer L.L.P., Phoenix, Attorneys for Amici Curiae Ken Bennett and Helen Purcell

————————

VICE CHIEF JUSTICE LOPEZ authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER, JUSTICES BOLICK, BEENE, MONTGOMERY, KING, and BRUTINEL (Ret.) joined.[*]

————————

VICE CHIEF JUSTICE LOPEZ, Opinion of the Court:

¶1        We explain today the reason for our prior decision order dismissing the challenge to Proposition 140—the "Make Elections Fair Act"

---

[*] Although Justice Robert M. Brutinel retired prior to the issuance of this Opinion, he participated in oral argument and in the decision of the Court.

2

initiative (the "Initiative")—for the November 2024 general election ballot. The thrust of the Initiative was to comprehensively change candidate elections in Arizona by replacing partisan primaries with an open primary. Although this Court's dismissal of the challenge permitted the Initiative to remain on the ballot, Arizona voters ultimately rejected the measure.

¶2　　　　　We hold that A.R.S. § 19-121.04(A), which required the Secretary of State to double count some invalid signatures, is unconstitutional as applied to the Initiative because it effectively raised the 15% signature threshold for proposing a constitutional amendment via initiative. *See* Ariz. Const. art. 21, § 1; *id.* art. 4, pt. 1, § 1(2). Absent this double counting, the Initiative would have satisfied the 15% constitutional requirement and qualified for the ballot. Therefore, we affirm the trial court's judgment dismissing the challenge to the Initiative.

## BACKGROUND

¶3　　　　　Beginning in November 2023, the Make Elections Fair PAC (the "Committee") circulated a statewide initiative petition seeking to amend the Arizona Constitution's partisan primary election system. *See* Ariz. Const. art. 7, § 10. The Committee needed 383,923 valid signatures to qualify the Initiative for the November 2024 general election ballot.

¶4　　　　　On July 3, 2024, the Committee filed an estimated 584,124 signatures with the Secretary of State, Adrian Fontes (the "Secretary"). The Secretary determined that 559,379 of these signatures were eligible for verification pursuant to A.R.S. § 19-121.01(A). On July 26, the Secretary selected a 5% random sample of these eligible signatures and transmitted them to the pertinent county recorders for verification. *See* § 19-121.01(B).

¶5　　　　　That same day, April Smith, Nira Lee, and Joshua Davidian ("Smith Plaintiffs") and the Arizona Free Enterprise Club, Susan Garvey, Kathleen Liles, and John Shadegg ("AFEC Plaintiffs") filed separate complaints against the State, the Secretary, and the Committee challenging the Initiative. The trial court consolidated the two cases. Together, the Smith and AFEC Plaintiffs (collectively "Plaintiffs") alleged the Initiative violated the Arizona Constitution's separate amendment rule, *see* Ariz. Const. art. 21, § 1, and included a misleading petition summary, *see* A.R.S. § 19-102(A). Plaintiffs also raised twenty-three objections to the legal

sufficiency of the circulator registrations and the petition signatures pursuant to A.R.S. §§ 19-118, -121, -121.01, and -122(C). Based on these allegations, Plaintiffs asked the trial court to declare the Initiative invalid and enjoin the Secretary from placing it on the ballot or printing any ballot that included the Initiative.

¶6 Faced with an August 22 ballot printing deadline, the trial court set an expedited case schedule and bifurcated Plaintiffs' challenges. First, the court ordered Plaintiffs to brief and argue their legal challenges concerning the separate amendment rule and petition summary. Then, the court scheduled a two-day trial on Plaintiffs' fact-intensive signature challenges. The court also appointed a special master to address some of Plaintiffs' objections to the Initiative signatures.

¶7 On August 9, the trial court rejected Plaintiffs' separate amendment and petition summary challenges and denied injunctive relief. Plaintiffs appealed, and we affirmed the trial court's ruling on August 22, leaving only the signature challenges.

¶8 On August 15, after a two-day hearing, the trial court issued a final judgment concerning the signature challenges. First, the court categorically overruled Plaintiffs' duplicate signature challenges ("Objection 21"), finding that the voluminous summary exhibits used to prove these challenges were inadmissible under Arizona Rule of Evidence 1006. Consequently, the court ruled that Plaintiffs categorically failed to prove any duplicate signatures by clear and convincing evidence. Second, based on prior evidentiary rulings, the court determined that the Committee presented sufficient valid signatures to satisfy the 383,923 constitutional minimum and ordered the Secretary to certify the Initiative for the ballot once the remaining counties reported their final certifications. Plaintiffs immediately appealed. On August 19, after the county recorders had completed their signature verifications, the Secretary certified the Initiative for the ballot.

¶9 On August 21, we reversed the trial court's Objection 21 ruling that categorically rejected Plaintiffs' duplicative signature challenges. We remanded to the trial court to examine the exhibits and determine whether Plaintiffs proved any duplicate signatures. If the trial

court found any duplicates, we instructed it to recalculate the number of valid signatures and make a new ballot eligibility determination.

¶10 The next morning, the trial court held a status conference with the parties. In the hearing, the court learned that the ballot-printing deadline changed from 11:59 p.m. that day to 6:00 a.m. the following morning—August 23. With the printing deadline looming, Plaintiffs asked the court to rule on the Objection 21 exhibits that day. The court refused, citing the practical impossibility of the task. Plaintiffs filed an emergency special action petition with this Court that evening arguing the trial court abused its discretion by refusing to review the exhibits before the printing deadline.

¶11 On August 23, this Court accepted jurisdiction. We rejected the Committee's argument that the ballot-printing deadline, by itself, extinguished Plaintiffs' right to challenge the eligibility of the Initiative to appear on the ballot.[1] We instructed the trial court to determine whether a sufficient number of valid signatures qualified the Initiative for the ballot. We also authorized the trial court to enjoin any votes cast for the Initiative if it ultimately disqualified the measure after ballots were printed. The Committee moved for reconsideration of our ruling authorizing the trial court to enjoin votes cast. We granted relief in part, clarifying that Plaintiffs could seek such an injunction, but that the Committee could contest the trial court's authority to disqualify votes cast.

¶12 On remand, the trial court appointed a new special master, who completed his review of the Objection 21 alleged duplicate signatures on September 17. The trial court held an evidentiary hearing the following day. The parties briefed their positions concerning the current signature counts and validity of the Initiative. At the hearing, the trial court heard testimony from the parties' experts, and argument on the mootness of Plaintiffs' challenge and the court's remedial authority. The court also

---

[1] In the order, we stated that "[t]here is no statutory directive that a court resolve an election challenge like this one before the ballot printing deadline." Although we acknowledged courts' customary effort and preference to resolve initiative challenges before the ballot-printing deadline, we reasoned that "[c]ourts cannot be forced to rule rashly to meet a ballot printing deadline or provide the parties with certainty."

heard the Committee's new argument that the statute directing the Secretary's final calculation—§ 19-121.04(A)—was unconstitutional as applied to the Initiative.

¶**13**     On September 19, the trial court entered its final judgment. The court dismissed Plaintiffs' Initiative challenge for three reasons. First, the lapsed August 23 printing deadline rendered the challenge moot. Second, § 19-121.04(A) was unconstitutional as applied under the Arizona and United States Constitutions. And third, the court lacked the remedial authority to grant Plaintiffs' requested injunction. Plaintiffs filed an expedited appeal to this Court. In a decision order, we affirmed the trial court's dismissal of Plaintiffs' challenge. We now explain our reasoning. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution and A.R.S. § 19-122(C).

## DISCUSSION

¶**14**     We review de novo the "interpretation and application of constitutional and statutory provisions regarding initiatives." *Molera v. Reagan*, 245 Ariz. 291, 294 ¶ 8 (2018).

¶**15**     The trial court rejected Plaintiffs' Initiative challenge on three grounds: mootness, unconstitutionality, and lack of remedial authority. We hold that § 19-121.04(A), as applied to the Initiative, unconstitutionally raised the 15% signature threshold for proposing a constitutional amendment via initiative. *See* Ariz. Const. art. 21, § 1; *id.* art. 4, pt. 1, § 1(2). Because we affirm the trial court's ruling on this constitutional ground, we do not address the mootness or remedy issues.

## I.

¶**16**     We begin by examining the constitutional and statutory provisions governing the signature requirements for constitutional initiatives.

## A.

¶**17**     "The right to initiate constitutional amendments and propose statutes was retained by the people when delegating legislative authority

6

to the Arizona legislature." *Stanwitz v. Reagan*, 245 Ariz. 344, 346 ¶ 2 (2018). To proffer a constitutional initiative, the interested party must submit signatures "equal to" 15% of all qualified electors. Ariz. Const. art. 21, § 1; *see also id.* art. 4, pt. 1, § 1(2). The Arizona Constitution quantifies "qualified electors" as the total number of people who cast votes in the previous gubernatorial general election. *Id.* art. 4, pt. 1, § 1(7).

¶18 The founders of the Arizona Constitution deliberately selected a 15% signature threshold to qualify initiatives for the ballot—nothing more, nothing less. During the constitutional convention, the founders debated whether to adopt a 10%, 15%, 18%, or 20% signature requirement. *The Records of the Arizona Constitutional Convention of 1910*, at 688–89 (John S. Goff ed., 1991) (hereinafter "Goff"). The 15% requirement prevailed. *Id.* at 689. Once the founders settled on the requisite quantum of signatures, they focused on the drafting language requiring a constitutional initiative be signed by "not less than" 15% of electors. The founders were wary that future legislatures "not in sympathy with the easy amendment of our constitution" would raise the threshold to "any percent above that" by "increas[ing] that percentage and still claim they were within the provisions of the constitution because they were *not less than*" the required percentage. *Id.* (emphasis added). To foreclose such manipulation, the convention agreed to change "not less than" to "a number equal to." *Id.* at 690. We must effectuate this intent to preserve the 15% signature threshold for constitutional initiatives. *See Fain Land & Cattle Co. v. Hassell*, 163 Ariz. 587, 595 (1990) ("The cardinal rule of constitutional construction is to follow the text and the intent of the framers, where it can be ascertained.").

**B.**

¶19 Arizona Revised Statutes chapter 1, title 19 regulates initiative petitions. After a party files an initiative petition, the Secretary must "review the submitted petitions, remove petition sheets and individual signatures on petition sheets that fail to comply with statutory requirements, and count the remaining signatures on the petition sheets." *Stanwitz*, 245 Ariz. at 346 ¶ 2. This preliminary process yields the total number of *eligible* signatures. § 19-121.01(A). If the total eligible signatures equals or exceeds the constitutional minimum, the Secretary selects and submits a random 5% sample of these signatures to the county recorders

for verification.  § 19-121.01(B).  The county recorders then review the sample and certify to the Secretary the total number of signatures disqualified for failing statutory standards (e.g., no residence address, unidentifiable signer, or duplicate signatures).  A.R.S. § 19-121.02(A), (B).  After receiving this certification, the Secretary then calculates and determines if the initiative contains enough *valid* signatures for ballot placement.  § 19-121.04(A), (B).

**¶20**　　　　At this final stage, the Secretary calculates the total number of valid signatures based on a three-step statutory formula.  The Secretary begins with the total number of *eligible* signatures.  § 19-121.04(A).  First, the Secretary subtracts from that total "[a]ll signatures that were removed pursuant to section 19-121.01, subsection A, paragraph 1."  § 19-121.04(A)(1).  Within this step, the Secretary also subtracts other signatures invalidated under A.R.S. § 19-118(F), which permits individual challenges on the same bases.  *See Mussi v. Hobbs*, 255 Ariz. 395, 402–03 ¶¶ 38–39 (2023).

**¶21**　　　　Second, the Secretary subtracts "[a]ll signatures that were found ineligible by the county recorders" but not previously subtracted.  § 19-121.04(A)(2).  Here, the Secretary also subtracts other signatures adjudicated ineligible due to individual challenges pursuant to § 19-122(C).  *See Mussi*, 255 Ariz. at 402–03 ¶¶ 41–43.[2]

**¶22**　　　　In the third and final step of the formula, the Secretary subtracts from the remaining signatures the number determined by applying the invalidity percentage rate.  *See* § 19-121.04(A)(3).  The Secretary calculates this rate by dividing the total number of signatures disqualified by the county recorders by the total number of signatures in the 5% random sample.  *See id.*  Therefore, in step three, the Secretary multiplies the number of signatures remaining after steps one and two by the invalidity rate, then subtracts that figure from the number of remaining signatures.  The mathematical equivalent, and simpler method, is to

---

[2]  Section 19-121.04(A)'s statutory formula does not expressly require the Secretary to subtract signatures invalidated in individual challenges.  However, this Court has held that a reading of the relevant statutory provisions as a whole necessitates this additional step.  *See Mussi*, 255 Ariz. at 402–03 ¶¶ 38–39, 41–43.

multiply the number of remaining signatures by the *validity* rate (i.e., 100% minus the invalidity percentage rate). Whether the Secretary subtracts the number determined by applying the *invalidity* rate from the remaining signatures, or multiplies the remaining signatures by the *validity* rate, the result is the same—the total number of valid signatures. If that total equals or exceeds the constitutional minimum, the Secretary must place the initiative on the ballot. § 19-121.04(B).

**¶23** Given the difficulty of conveying this mathematical equation linguistically when such concepts are typically best illustrated visually, we offer the following summary of § 19-121.04(A)'s calculation:

Total eligible signatures: X
> Step 1: Subtract all signatures removed pursuant to § 19-121.01(A) paragraph 1 by the Secretary, county recorders, or by individual challenges.
>
> Step 2: Subtract other signatures disqualified by county recorders or adjudicated ineligible by individual challenges.
>
> Step 3: Multiply the remaining signatures by the validity rate.

**= total valid signatures**

**¶24** Notably, this formula mandates a double counting of some invalid signatures. This occurs when "deducting signatures found invalid by county recorders" in step two "and then using the same number as the numerator in determining the invalidity rate" in step three. *See Mussi*, 255 Ariz. at 404 ¶ 51; *id.* at 408 ¶ 67 (Timmer, VCJ., concurring and dissenting in part) ("By deducting the signatures disqualified by the county recorders and also applying the invalidity percentage rate to the total number of eligible signatures initially identified by the Secretary, disqualified signatures are counted twice."); *City of Flagstaff v. Mangum*, 164 Ariz. 395, 404 (1990) ("We recognize that the method we have set forth will still result in a percentage of the invalid signatures in the random sample being deducted twice."). Both parties' experts testified to the illogic of this calculus. The Committee's expert testified that "when the county recorders remove signatures from the 5% sample as invalid, subtracting those signatures from the Population and then applying the validity rate to the

Population is mathematically indefensible." Plaintiffs' expert conceded this point.

**¶25** Double counting of invalid signatures occurs because the invalidity rate represents both the signatures actually disqualified by the county recorders and the projected ineligible signatures in the total population; it is duplicative to deduct both. Logic suggests that the Secretary should not subtract the signatures disqualified by the county recorders and instead use that number merely to determine and apply the validity rate. But in *Mussi* and *Mangum*, we concluded that § 19-121.04(A) mandates this double counting. *Mussi*, 255 Ariz. at 404 ¶ 51; *Mangum*, 164 Ariz. at 404. *Mussi* and *Mangum*, however, did not present a constitutional challenge to this calculus—the sole issue we must decide in this case.

## II.

**¶26** We now consider § 19-121.04(A)'s constitutionality as applied to the Initiative. "A statute regulating a provision of our constitution is permissible if it 'does not unreasonably hinder or restrict the constitutional provision and if the [statute] reasonably supplements the constitutional purpose' of the provision." *Stanwitz*, 245 Ariz. at 348 ¶ 14 (alteration in original) (quoting *Direct Sellers Ass'n v. McBrayer*, 109 Ariz. 3, 5 (1972)). "An 'as-applied' challenge assumes the standard is otherwise constitutionally valid and enforceable, but argues it has been applied in an unconstitutional manner to a particular party." *Korwin v. Cotton*, 234 Ariz. 549, 559 ¶ 32 (App. 2014); *see also Dahnke-Walker Milling Co. v. Bondurant*, 257 U.S. 282, 289 (1921) ("A statute may be invalid as applied to one state of facts and yet valid as applied to another.").

**¶27** To equal or exceed the 15% constitutional signature threshold, the Committee had to produce 383,923 valid signatures to require the Secretary to place the Initiative on the November 2024 general ballot. The Secretary began with 559,379 eligible signatures, which was reduced after subtracting signatures invalidated by the counties, the trial court, and the special master pursuant to § 19-121.04(A). At the close of the litigation, the parties confirmed the following accounting:

| | § 19-121.04(A) Calculation | Signatures with 2a | Signatures without 2a |
|---|---|---|---|
| | Total eligible signatures | 559,379 | 559,379 |
| 2a | Signatures invalidated by the counties | 6,616 | - - - |
| 2b | Signatures invalidated by the court | 16,705 | 16,705 |
| 2c | Signatures invalidated by the special master | 37,674 | 37,674 |
| 3 | Multiply by validity rate | 0.76345 | 0.76345 |
| | **Total valid signatures** | **380,491** | **385,542** |

¶28　　　　The Initiative's ballot eligibility turned on whether the court double counted the 6,616 signatures invalidated by the counties as required by § 19-121.04(A). Although the Committee collected 559,379 eligible signatures in its attempt to produce 383,923 valid signatures, the margin between success and failure was razor thin. If the court subtracted the signatures invalidated by the counties *and* applied the validity rate—the Initiative failed by 3,432 signatures. But if the court *only* applied the validity rate—the Initiative achieved ballot eligibility by 1,619 signatures.

¶29　　　　The Committee argues that § 19-121.04(A) is unconstitutional as applied to the Initiative because it effectively raised the signature threshold for placing the Initiative on the ballot. The Committee's expert testified, and the trial court agreed, that the statute's formula required the Committee to collect signatures from 15.2% of the qualified electors to offset the double counting. Plaintiffs and legislative leaders argue that the statute does not violate the constitution by raising the 15% signature requirement. In a joint brief, Senate President Warren Petersen and House Speaker Ben Toma concede that § 19-121.04(A), as applied, raised the 15% threshold to 15.2%, but contend that this incremental increase was so "small" and "negligible" that it did not run afoul of the constitution.

¶30　　　　We conclude that effectively increasing the signature threshold in this case from 15% to 15.2% violates the Arizona Constitution for three reasons. First, the increase is not insignificant—it is dispositive. Here, § 19-121.04(A)'s double counting would have disqualified the Initiative from the ballot. The statute's formula effectively raised the 15% threshold by requiring the Committee to collect additional signatures to compensate for the double counting penalty—a clear violation of the express constitutional requirement. *See* Ariz. Const. art. 21, § 1. To be sure,

11

had the Committee's total valid signatures remained above or below the constitutional minimum—regardless of the duplicative deduction—§ 19-121.04(A)'s formula would not have yielded an unconstitutional result because it would not have "unreasonably hinder[ed] or restrict[ed]" the constitution by increasing the required number of signatures. *Stanwitz*, 245 Ariz. at 348 ¶ 14 (quoting *Direct Sellers Ass'n*, 109 Ariz. at 5).

**¶31** Second, the legislative leaders' attempt to justify the "small" increase to the 15% threshold as "negligible," despite its fatal effect on the Initiative, overlooks the founders' concerns regarding the initiative signature requirement. *See* Goff, *supra* ¶ 18, at 690. We cannot so readily dismiss the founders' express constitutional requirement that signatures equate to "a number of qualified electors *equal to* fifteen percent." *See* Ariz. Const. art. 21, § 1 (emphasis added); *see also Fain Land & Cattle Co.*, 163 Ariz. at 595. The 15% threshold is a fixed point that neither this Court nor the legislature can increase, even incrementally.

**¶32** Finally, we find *Turley v. Bolin*, 27 Ariz. App. 345 (1976), pertinent and persuasive. In *Turley*, the court of appeals invalidated a statute that accelerated the constitutionally established filing date for initiative petitions. *Id.* at 350. There, the circulators submitted their petitions by the Arizona Constitution's filing date (four months before the election) but failed to meet the controlling statutory deadline (five months before the election). *Id.* at 347. In defense of the statute's deadline, the challengers argued that the founders would have permitted a five-month filing deadline to account for the increased demands of population growth. *Id.* at 348–49. They also argued that the constitution merely established a filing schedule floor—not a ceiling—because it provided that a petition must be filed "not less than four months preceding the date of the election." *See id.*; *see also* Ariz. Const. art. 4, pt. 1, § 1(4). The court disagreed, explaining:

> [W]e necessarily reject appellants' contention that by using the words '. . . not less than four months . . .' the framers of the constitution intended to provide a flexible filing standard subject to change at will by the legislature, whenever changing conditions might appear to the legislature to justify

a departure from the initially mandated constitutional standard.

*Turley*, 27 Ariz. App. at 350. The court also reasoned that this filing requirement was "not subject to future derogation by the legislature" in light of the "important legislative rights reserved in the people" (i.e., the initiative powers) which are not "subordinate to any legislative rights vested in the legislature." *Id.*

¶33 The principle voiced in *Turley* applies with even greater force here. Unlike in *Turley*, the 15% signature threshold for constitutional initiatives is express and is *not* even arguably flexible because it is a fixed point. Article 21, section 1's text—"equal to"—and the records of the constitutional convention establish the unambiguous meaning and purpose of the 15% signature requirement. Because the right to present a constitutional initiative rests with the citizens' constitutionally reserved legislative powers, the legislature cannot invoke its own authority to deviate from the 15% standard. *See id.*

¶34 In sum, we hold that § 19-121.04(A) is unconstitutional as applied under the Arizona Constitution because it impermissibly raises the 15% signature threshold for constitutional initiatives by requiring the Committee to collect additional valid signatures to compensate for the statute's double counting. But for this mathematical anomaly, the Initiative would have satisfied the constitutional threshold. We also affirm the trial court's ruling that § 19-121.04(A) is unconstitutional as applied under the United States Constitution. The statute's constitutional infirmity, as applied under the Arizona Constitution, also infringes the Committee's federal First Amendment constitutional rights. *See Pierce v. Jacobsen*, 44 F.4th 853, 859–60 (9th Cir. 2022) (recognizing that a state-created initiative process is "protected by the First Amendment" and thereby unconstitutional when it "significantly inhibit[s] the ability of initiative proponents to place initiatives on the ballot." (alteration in original) (quoting *Angle v. Miller*, 673 F.3d 1122, 1133 (9th Cir. 2012))).

## CONCLUSION

¶35 Although every statewide constitutional initiative is subject to § 19-121.04(A)'s mandated double counting, the increase to the 15%

signature requirement is modest and typically has no practical effect on initiative ballot qualification. But in close cases, as here, the statute's double counting may operate to improperly disqualify an initiative from the ballot by effectively increasing the 15% signature requirement. We defer to the legislature to decide whether to reconsider the statutory signature validation formula in light of its potential to violate the Arizona and United States Constitutions in closely contested initiative signature challenges.

¶36            For the reasons stated, we affirm the trial court's judgment dismissing the challenge to the Initiative.